# JOINT INTENTIONS AND COMMITMENTS

Enhanced student achievement based upon high standards and expectations must be the driving force behind every activity of New York City public schools. To accomplish this, we must reinvent schools so that decision making is shared by those closest to students, including parents, teachers, administrators and other stakeholders. Layers of bureaucratic impediments must be peeled away so that flexibility, creativity, entrepreneurship, trust and risk-taking become the new reality of our schools. The factory model schools of the 1900s must make way for the child-centered schools of this century.

To this end, the Union and the Board mutually agree to join together with other partners in the redesign and improvement of our schools, including closing those that have failed and supporting their restructuring. We must challenge ourselves each day to improve student learning, based upon academic rigor, newfound flexibility, meaningful assessments and true accountability. Roles and responsibilities of parents, staff and other partners must be defined. The standards to which we hold our students must never be lower than those we hold for our own children. To accomplish this, we must focus on both the depth and breadth of each proposed instructional and operational change, each designed to support the children and their teachers, whom we expect to meet these rigorous standards.

Change must be service-oriented, supportive and sufficiently flexible so that each school's educational vision can become a reality. It must be practical, possible, efficient and timely. Respect for each other and for every student must be unconditional if we are to accomplish what we must.

To reach these goals, we commit to working together along with other stakeholders to develop specific recommendations in areas requiring immediate attention. These will include, but not be limited to:
- School Based Budgeting
- Early Intervention and Prevention of Inappropriate Referrals to Special Education
- Professional Development
- Parent Outreach and Support
- Workload Standards.

This commitment is our pledge to the children of the City of New York, not just to a promise but to a reality of educational excellence.

AGREEMENT MADE AND ENTERED INTO on the 1st day of May, 2014, by and between THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK (hereinafter referred to as the "Board") and UNITED FEDERATION OF TEACHERS, Local 2, American Federation of Teachers, AFL-CIO (hereinafter referred to as the "Union" or "UFT").

WHEREAS, the Board has voluntarily endorsed the practices and procedures of collective bargaining as a peaceful, fair and orderly way of conducting its relations with its employees insofar as such practices and procedures are appropriate to the special functions and obligations of the Board, are permitted by law and are consonant with the paramount interests of the school children, the school system and the public; and

WHEREAS, in a special referendum conducted among the professional educational personnel, over seventy percent of those who participated favored collective bargaining as a way of conducting their relations with the Board; and

WHEREAS, the Union has demonstrated in a secret ballot election that it represents a majority of those assigned as classroom teachers in the regular day school instructional program and has shown by other satisfactory evidence that it represents a majority of those employed as per session teachers, a majority of those assigned as WNYE teachers, a majority of teachers employed in WIN, a majority of teachers and counselors employed in WEP, a majority of employees employed by MDTP, a majority of teachers assigned to central headquarters and district offices, and, in accordance with Board policy, is therefore the exclusive collective bargaining representative for all such employees; and

WHEREAS, pursuant to the Arbitration Award in AAA Case No. 1339-0416-80 certain education administrators were accreted to the bargaining unit; and

WHEREAS, pursuant to the operation of Article One of this Agreement, certain education officers, education analysts, associate education officers and associate education analysts, other than managerial or confidential employees, are accreted to the bargaining unit; and

WHEREAS, other than occasional per diem substitutes were accreted to the bargaining unit pursuant to a determination by the Public Employment Relations Board; and

WHEREAS, the Union has shown by satisfactory evidence that a majority of substitute vocational assistants wish to be represented by the Union for purposes of collective bargaining, and the Union was designated as the exclusive collective bargaining representative for all such employees; and

WHEREAS, the Union has shown by satisfactory evidence that a majority of teacher's assistants wish to be represented by the Union for purposes of collective bargaining, and the Union was designated as the exclusive collective bargaining representative for all such employees; and

WHEREAS, the parties entered into an Agreement effective October 13, 2007 until October 31, 2009; and

WHEREAS, the parties entered into a Memorandum of Agreement on May 1, 2014 effective from November 1, 2009 through November 30, 2018 (the "May 1st MOA"); and

WHEREAS, the Board and its designated representatives have met with representatives of the Union and fully considered and discussed with them, on behalf of the employees in the bargaining unit, changes in salary schedules, improvements in working conditions, and machinery for the presentation and adjustment of certain types of complaints, it is agreed as follows:

## ARTICLE ONE
## UNION RECOGNITION

The Board recognizes the Union as the exclusive bargaining representative of all those assigned as teachers in the regular day school instructional program; all those employed as per session teachers; all those assigned as teachers at WNYE; all primary and non-primary adult education employees; teachers assigned to headquarters or district offices (except supervisors and occasional per diem substitutes); certain education

administrators; certain education officers, education analysts, associate education officers and associate education analysts; substitute vocational assistants; and teacher's assistants.

The term "teachers in the regular day school instructional program" (herein referred to as "day school teachers" or "teachers" or "employees") comprises the following teacher categories:

Teachers of early childhood classes; teachers in the elementary schools; teachers in intermediate schools; teachers in junior high schools; teachers in day academic and day vocational high schools; teachers of health conservation classes; teachers of homebound children; teachers of visually handicapped children; teachers of children with retarded mental development; teachers of speech improvement; teachers in schools for the deaf; teachers in special day schools, day treatment centers or institutional settings; teachers in adult education appointed to fulltime service under licenses issued pursuant to Section 401 of the Board of Education by-laws; teachers in occupational training centers; and all other teachers employed by the Board including all those employed in non-public schools.

The term "certain education administrators" (herein referred to as "education administrators") comprises all non-supervisory education administrators at Level I.

The term "certain education officers, education analysts, associate education officers and associate education analysts" (herein referred to as "education officers and education analysts") comprises employees in the titles Education Officer, Education Analyst, Associate Education Officer, and Associate Education Analyst except those serving in the Offices of the Chancellor, Deputy Chancellors, Labor Relations and Collective Bargaining, and Legal Services; those serving in the Division of Budget Operations and Review and in the Division of Human Resources, except employees who are neither managerial nor confidential as defined in Section 201.7 of Article 14 of the CSL; and those serving elsewhere in the Board of Education who are managerial or confidential as defined in Section 201.7 of Article 14 of the CSL.

During the term of this Agreement should the Board employ a new title or category of employees having a community of interest with employees in the existing bargaining unit described herein, employees in such new title or category shall be included within the existing bargaining unit, and upon request of the Union the parties shall negotiate the terms and conditions of employment for such new title or category of employees; but nothing contained herein shall be construed to require re-negotiation of terms and conditions of employment applicable to employees in the existing bargaining unit as a result of the Board's re-designation of the title or category of employees in the unit.

Nothing contained herein shall be construed to prevent any Board official from meeting with any employee organization representing employees in the bargaining unit for the purpose of hearing the views and proposals of its members, except that, as to matters presented by such organizations which are proper subjects of collective bargaining, the Union shall be informed of the meeting and, as to those matters, any changes or modifications shall be made only through negotiations with the Union.

It is understood that all collective bargaining is to be conducted at Board headquarters level. There shall be no negotiation with the Union chapter or with any other employee group or organization at the school level. It is further understood that there shall not be established or continued in any school a Staff Relations Committee as described in the Staff Relations Plan issued by the Board on October 23, 1956.

Nothing contained herein shall be construed to prevent any individual employee from informally discussing a complaint with his/her immediate supervisor.

Nothing contained herein shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable civil service laws and regulations.

## ARTICLE TWO
## FAIR PRACTICES

The Union agrees to maintain its eligibility to represent all teachers by continuing to admit persons to membership without discrimination on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition or age and to represent equally all employees without regard to membership or participation in, or association with the activities of, any employee organization.

The Board agrees to continue its policy of not discriminating against any employee on the basis of race, creed, color, national origin, sex, marital status, sexual orientation, handicapping condition, age or membership or participation in, or association with the activities of, any employee organization.

The Board agrees that it will not require any teacher to complete an oath or affirmation of loyalty unless such requirement is established by law.

The Board of Education agrees that, as a result of the strike and its related activities, it will not dismiss, demote, discipline, or otherwise act against any staff member because of his or her participation in said strike or related activities. Specifically excluded from the foregoing are any and all provisions of the Taylor Law (New York Civil Service Law, Section 200 et seq.), none of which are waived hereby.

Any records of court proceedings or other memoranda relating to job action or strike shall not be put in a staff member's permanent file, except as required by law.

## ARTICLE THREE
## SALARIES AND BENEFITS OF
## DAY SCHOOL TEACHERS

**A. Salaries and Differentials**

The salaries and differentials of day school teachers and the eligibility requirements therefor are set forth in pertinent part in Appendix A which is attached to and made a part of this Agreement.

**B. Staff Development Rate**

The hourly rate for paid attendance at training sessions shall be:
Effective May 19, 2008………………………………………$19.12
Effective May 1, 2013……………………………………….$19.31
Effective May 1, 2014……………………………………….$19.50
Effective May 1, 2015……………………………………….$20.09
Effective May 1, 2016……………………………………….$20.79
Effective May 1, 2017……………………………………….$21.74
Effective May 1, 2018……………………………………….$22.17
Effective June 16, 2018……………………………………..$22.84

### C. Salary Credit

#### 1. Regular Substitute Service

An appointee as a regular teacher who has performed prior satisfactory service as a regular substitute teacher for a period of one or more terms shall be placed in the appropriate salary schedule as though all such regular substitute teaching service had been performed in the capacity of a regular teacher; and such appointee shall be given salary credit for each term of such regular substitute teaching preceding appointment.

#### 2. Per Diem Substitute Service

An appointee as a regular teacher shall be granted one year of salary credit for each 170 days of prior satisfactory substitute service in the day public schools of the City of New York.

An appointee as a regular teacher who has had 85 or more days of such substitute service, but fewer than 170 days, or who has 85 or more days in excess of 170 days, or multiple thereof, shall receive one term of salary credit.

Effective June 26, 2002, newly appointed persons shall enter at a salary step not higher than step 8B and shall receive salary credit for each term up to 20 of prior regular substitute service and prior per diem substitute service. Appointed incumbents' salary steps shall be adjusted effective June 26, 2002.

#### 3. Industrial Experience

An appointee as a teacher of shop subject-trades shall be granted salary credit for appropriate industrial experience beyond that required for satisfying the eligibility requirements prescribed in Chancellor's Regulation C-389 on a year by year basis up to a maximum of ten (10) years.

Effective February 1, 1985 a teacher of shop subject-trades shall be granted salary credit for appropriate industrial experience gained within the ten (10) years immediately preceding date of appointment for appointees or date of original license or certificate for substitutes, on a year for year basis, as prescribed in Chancellor's Regulations C-500 and C-535.

#### 4. Nursing Experience

An appointee as a teacher of nursing in day high school shall be granted salary credit for appropriate nursing experience as a registered nurse beyond that required for satisfying the eligibility requirements prescribed in Chancellor's Regulation C-386 on a year by year basis up to a maximum of ten (10) years.

Effective February 1, 1985, a teacher of nursing in day high school shall be granted salary credit for appropriate nursing experience as a registered nurse gained within the ten (10) years immediately preceding date of appointment for appointees or date of original license/certificate for substitutes, on a year for year basis, as prescribed in Chancellor's Regulations C-500 and C-535.

### D. College Credits for Differentials

All college credits creditable toward college work in excess of the number required for the baccalaureate, whether earned before or after graduation, shall be applicable for differential purposes, except as otherwise provided herein.

Effective for courses commenced after September 8, 1980 correspondence courses will no longer be acceptable for salary differentials or advancement on the increment schedule.

**E. Application for Certain Salary Differentials**

Effective July 1, 1964, teachers who, at the time of appointment, were not required to hold a baccalaureate degree as an exclusive prerequisite to qualify for the teaching license may apply under either of the following methods for the salary differential provided in Salary Schedule C2 or C6 of Appendix A hereof:

They may submit evidence of having completed the required number of semester hours of approved study, or

They may be credited with 26 semester hours of approved study by reason of having reached the maximum step of Salary Schedule C1 or C2. In addition, they shall submit evidence of the completion of the required additional number of semester hours of approved study, which additional hours must have been completed prior to the date of appointment or subsequent to the date of placement on the maximum step of the salary schedule.

**F. Vacation Pay**

**1. Summer Vacation Pay**

Summer vacation pay shall be prorated for the school year in which teachers are appointed and for the school year in which their service ceases on the following basis: Teachers who are appointed after the start of the school year and teachers who are terminated, laid off, resign or retire on/or before the end of the school year shall receive vacation pay for the summer following their appointment or cessation of service as follows: one-tenth of the amount of the vacation pay which would be payable for a full school year's service shall be paid for each month of service or major fraction thereof during the school year in which they are appointed or cease service except that service of less than a major fraction during the first month of appointment shall be credited for summer vacation pay. The pro-rating of summer vacation pay for the year in which teachers are appointed and for the year in which their service ceases in accordance with this provision shall not diminish the teacher's entitlement to any other benefit including health insurance and welfare coverage he/she would have received under the prior method of payment.

An employee who serves as a regular or per diem substitute and is appointed after the beginning of the school year shall be entitled to the additional vacation pay of a regular or per diem substitute for the year in which he/she is appointed on the basis of his/her substitute service prior to his/her appointment.

**2. Vacation Pay Credit and Service Credit**

a. The estate of a teacher who dies during the school year shall receive a pro-rata amount, based on the length of his/her employment during the school year, of the vacation pay he/she would have received had he/she been employed during the entire school year. This section shall not apply to those teachers who are presumed to have retired on the day immediately preceding their death pursuant to Section B 20-410 of the Administrative Code of the City of New York, as amended.

b. A regularly appointed teacher who has rendered actual service during any school year covered in part by leave of absence for maternity and child care shall be given credit for salary increment purposes for any pro-rata vacation pay received for such service.

### G. Health Insurance and Welfare Fund Benefits
   1. **Choice of Health Plans**

The Board agrees to arrange for, and make available to each day school teacher, a choice of health and hospital insurance coverage from among designated plans and the Board agrees to pay the full cost of such coverage.

Regularly appointed teachers who are laid off and who are covered by a health and hospital insurance plan at the time they are laid off shall continue to be so covered for ninety days from the day on which they are laid off, and the Board will pay the full cost of such coverage.

The Board, the Union and the City of New York ("City") continue to discuss, on an ongoing basis the Citywide health benefits program covering employees represented by the Union and employees separated from service. Any program-wide changes to the existing basic health coverage will be expressly incorporated into and made a part of this Agreement. The provisions of Appendix E (Health Insurance) shall apply as modified herein.

The parties acknowledge that collective bargaining regarding health benefits is within the purview of negotiations between the Municipal Labor Committee and the City. Cost-containment initiatives and program modifications in the City Health Benefits Program shall be discussed with the Municipal Labor Committee.

   2. **Supplemental Welfare Fund Benefits**

   a. The Board will provide funds at the rate of $1,720 ($1,745 effective July 1, 2014, $1,770 effective July 1, 2015, $1,795 effective July 1, 2016, $1,820 effective July 1, 2017) per year on a pro-rata basis per month on behalf of each day school teacher, for the purpose of making available for each day school teacher supplemental welfare benefits and for the purpose of making available college scholarships for children from low income families graduating from the City's public high schools under a plan devised and established jointly by representatives of the Union and of the Board. The Board will continue to make payments for supplemental benefits at the rates per year set forth herein on a pro-rata basis per month for ninety days from the day of layoff on behalf of each regularly appointed teacher who is laid off.

   b. Domestic partners of covered employees will be provided with welfare fund benefits in the same manner in which covered employees who are married receive such benefits for their spouses.

   c. The Union has established a supplemental welfare benefits fund program for employees represented by the Union who have separated from service subsequent to June 30, 1970, who were eligible to receive supplemental welfare benefits and who were covered by a welfare fund at the time of such separation pursuant to a separate agreement between the Board of Education and the certified Union representing such employees, who remain primary beneficiaries of the New York City Health Insurance Program and are entitled to benefits paid for by the City through such program.

The Board of Education shall contribute the following annual amount on a pro-rata monthly basis for each eligible individual for remittance to the Union to such supplemental benefits fund pursuant to the terms of the supplemental agreement:

   (1) Eligible employees separated from service from July 1, 1970 through September 8, 1982:

   Effective November 1, 2009...................$1,160

    Effective July 1, 2014............................$1,185  
    Effective July 1, 2015............................$1,210  
    Effective July 1, 2016............................$1,235  
    Effective July 1, 2017 ...........................$1,260  

  (2) Eligible employees separated from service after September 8, 1982:  
    Effective November 1, 2009....................$1,600  
    Effective July 1, 2014............................$1,625  
    Effective July 1, 2015............................$1,650  
    Effective July 1, 2016............................$1,675  
    Effective July 1, 2017............................$1,700  

  d. Employees who are separated from service and thereafter return to active service will be entitled to the same Welfare Fund benefits as other active employees. For the period of their active employment, such employees will not also receive retiree benefits. Accordingly, the Union Welfare Fund will receive only one contribution on behalf of each such employee, which shall be at the applicable contribution rate for active employees.

  e. The 2009 Health Benefits Agreement, dated July 2, 2009 between the City Commissioner of Labor Relations James F. Hanley and Municipal Labor Committee Chair Harry Nespoli, is deemed to be part of this Agreement. The Letters of Agreement regarding Welfare Fund Contributions, dated May 5, 2014 and August 14, 2014, between the City Commissioner of Labor Relations Robert W. Linn, and Municipal Labor Committee Chair Harry Nespoli, are deemed to be part of this Agreement. The side letter agreement between the City Commissioner of Labor Relations James F. Hanley and UFT President Randi Weingarten, dated October 21, 2004, is deemed to be part of this Agreement. Pursuant to those Agreements, the parties have agreed to a series of payments to the Welfare Fund.

  f. Pursuant to the Municipal Labor Coalition Benefits Agreement, the Union Welfare Fund shall provide Welfare Fund benefits equal to the benefits provided on behalf of an active Welfare Fund-covered employee to widow(ers), domestic partners and/or children of any active Welfare Fund-covered employee who dies in the line of duty as that term is referenced in Section 12-126(b)(2) of the New York City Administrative Code. The cost of providing this benefit shall be funded by the Stabilization Fund.

  **3. Health Care Flexible Spending Account**

  a. A flexible health care spending account has been established pursuant to Section 125 of the Internal Revenue Code. Those employees covered by this Agreement are eligible to participate on the same basis as they are eligible to participate in the Citywide health benefits program. Participating employees shall contribute at least $260 per year up to a maximum of $5,000 per year. The labor-management health committee which includes Union and City representatives may modify these contribution levels, based on experience of the plan.

  b. Expenses covered by the account shall include but not be limited to deductibles, co-insurance, co-payments, excess expenses beyond plan limits, physical exams and health related transportation costs for vision, dental, medical and prescription drug plans where the employee and dependents are covered. In no case will any of the above

expenses include those non-deductible expenses defined as non-deductible in IRS Publication 502.

    c. An administrative annual fee of $48.00 shall be charged for participation in the program. Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

### 4. Dependent Care Assistance Program

    a. A dependent care assistance program has been established pursuant to Section 125 of the Internal Revenue Code. Those employees covered by this Agreement are eligible to participate on the same basis as they are eligible to participate in the Citywide health benefits program. Participating employees shall contribute at least $500 per year up to a maximum of $5,000 per year. The labor-management health committee which includes Union and City representatives may modify these contribution levels, based on experience of the plan.

    b. An annual administrative fee of $48.00 shall be charged for participation in the program. Pursuant to Section 125 of the Internal Revenue Code, an employee's participation in the account is irrevocable during any plan year and any excess funds in an employee's account at the close of any plan year is retained by the plan and not refundable to the employee.

### 5. Retiree Health Insurance Coverage

The parties shall jointly take whatever action is necessary, including joint support of legislation, to modify retiree eligibility for health insurance coverage so that vested retirement and service retirement retirees with less than fifteen (15) years of credited service as a member of such retirement or pension system shall no longer be eligible for health insurance and welfare benefit coverage, although they may remain vested for pension purposes after ten (10) years of credited service.

The above shall apply to UFT-represented employees in TRS and BERS hired after the legislation is enacted.

## H. Reimbursement for Medical Expenses

Teachers shall be reimbursed by the Board for reasonable medical expenses, not exceeding $750, incurred because of injuries in the line of duty, to the extent that such expenses are not covered by insurance.

In accordance with existing regulations, as they may be modified by the parties, this limit is waived for employees injured as a result of an unprovoked assault while on duty or while on school premises.

## I. Damage or Destruction of Property

1. Teachers shall not be held responsible for loss within the school of school property or children's property when such loss is not the fault of the teacher.

This does not exonerate the teacher from responsibility for school property in his/her charge.

2. The Board of Education will reimburse teachers, in an amount not to exceed a total of $100 in any school year, for loss or damage or destruction, while on duty in the school or while on duty on a field trip, of personal property of a kind normally worn to or brought into school, or on a field trip, when the teacher has not been negligent, to the extent that such loss is not covered by insurance.

The term "personal property" shall not include cash. The terms "loss," "damage" and "destruction" shall not cover the effects of normal wear and tear and use.

3. Teachers of the homebound shall be reimbursed for loss or damage or destruction, while on official duty on field assignments, of personal property of a kind normally worn or carried on duty when such loss results from force or violence reported to the police. Reimbursement will be limited to a total of $100 in any school year; will be made when the teacher of the homebound has not been negligent; and will be granted to the extent that such loss is not covered by insurance. The term "personal property" shall not include cash. The terms "loss," "damage" and "destruction" shall not cover the effects of normal wear and tear and use.

### J. Reimbursement for Telephone Calls

Teachers of the homebound shall be reimbursed for all business telephone calls.

### K. Transportation Benefits

#### 1. Reimbursement for Use of Cars

a. Teachers of the homebound, except for those who work principally in mid-town Manhattan, will be given authorization to use their personal cars on official business in accordance with criteria, procedures and other requirements of generally applicable rules and regulations issued by the Chancellor. Employees who are authorized to use their personal cars on official business shall be reimbursed in accordance with the allowance established by the City Comptroller.

It is understood that this provision is subject to the continuing budgetary authority of the Board to permit use of personal cars on official business.

b. Teachers of nursing may be authorized by their supervisor to use their personal cars to travel between the school and clinic on official business in accordance with criteria, procedures and other requirements of generally applicable rules and regulations issued by the Chancellor. Employees who are authorized to use their personal cars on official business shall be reimbursed in accordance with the allowance established by the City Comptroller.

#### 2. Transportation Benefit Program

Employees are eligible to participate in the NYC Transit Chek program.

The parties agree that the City will expand the current Transit Chek program to offer to eligible employees the ability to purchase a Transit Debit Card through payroll deductions in accordance with IRC Section 132. In addition to the current MTA Surface and Subway lines, the Transit Debit Card may be used to purchase tickets for mass transit commutation only (i.e., LIRR, LI MTA Buses, MetroNorth). The administrative fee for this benefit will be borne by the participants and will be deducted on a prorated basis from the participating employee's paycheck. After one year of experience with this benefit, the City will examine the level of participation and the associated costs of providing this benefit to determine whether or not the administrative fee requires adjustment.

The parties further agree to examine the possible expansion of this benefit to include other regional mass transit carriers.

### L. Salary Payment

1. The parties agree that a biweekly payroll gives employees a date certain for receipt of their pay. Therefore, the Board will convert the pedagogical payroll to a biweekly payroll from the existing semi-monthly payroll as soon as practicable. The

parties will make whatever contractual changes are technically necessary to accomplish this goal.

2. On the last day of the school year, employees shall receive five (5) paychecks which are not to be cashed until the date appearing on the paychecks dated on or about June 30, July 15, July 30, August 15 and August 31.

The Board and the Union agree that any employee who attempts to cash or cashes any of these five paychecks prior to the date on the paycheck(s) shall thereafter reimburse the Board and/or the City of New York for any costs resulting from such action by deduction of such costs from the payments due to said employee.

The early distribution of these five paychecks shall end if five (5) percent of the paychecks in any one summer are prematurely cashed and the practice in existence prior to this Agreement shall resume.

3. The Board will recommend to the Comptroller of the City of New York that he/she itemize more fully employee pay checks and that he/she provide accompanying explanations when lump sum payments are made.

4. The Board has in place an electronic funds transfer ("EFT") program without resort to a payroll lag for those bargaining unit members who are regularly scheduled employees in titles paid on the Q Bank and who elect the receipt of their paychecks by electronic funds transfer. Annual enrollments will take place each March.

5. As of school year 2007-2008, all newly-hired employees of the Board of Education shall have their wages paid through direct deposit.

**M. Performance Incentives Committee**

A committee co-chaired by the Chancellor, the President of the UFT and the New York City Commissioner of Labor Relations, or his or her high-ranking designee, shall be established to investigate the viability and desirability of merit pay and to address other compensation issues such as comparability, skills and responsibility, shortage and hard to staff areas and potential career ladder opportunities.

**N. Ratification Bonus**

1. A lump sum cash payment in the amount of $1,000, pro-rated for other than full time employees, shall be payable as soon as practicable upon ratification of the May 1st MOA to those employees who are on payroll as of the day of ratification. This lump sum is pensionable, consistent with applicable law, and shall not be part of the Employee's basic salary rate.

2. Any disputes arising under this section N shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**O. Structured Retiree Claims Settlement Fund**

1. Upon ratification, the City shall establish a Structured Retiree Claims Settlement Fund in the total amount of $180 million, as modified by the decision of Arbitrator Martin F. Scheinman dated November 17, 2014, to settle all claims by retirees who have retired between November 1, 2009 through June 30, 2014 concerning wage increases arising out of the 2009-2011 round of bargaining. The Fund will be distributed based upon an agreed upon formula.

2. Any disputes arising under this section O shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**P. Lump Sum Payments Stemming From the 2009-2011 Round of Bargaining**

1. <u>Schedule for actives for those continuously employed as of the day of payout:</u>

     i.   10/1/15 – 12.5%
    ii.   10/1/17 – 12.5%
   iii.   10/1/18 – 25%
   iv.   10/1/19 – 25%
    v.   10/1/20 – 25%

2. Employees who retire after June 30, 2014 shall receive lump sum payments based on the same schedule as actives as set forth in this section P.

3. Any disputes arising under this section P shall be determined by Martin F. Scheinman. The parties shall share the costs of his services.

**Q. Healthcare Savings**

1. The UFT and the City/DOE agree the UFT will exercise its best efforts to have the MLC agree to the following:

   a. for fiscal year 2015 (July 1, 2014-June 30, 2015), there shall be $400 million in savings on a citywide basis in health care costs in the NYC health care program.

   b. for fiscal year 2016 (July 1, 2015-June 30, 2016), there shall be $700 million in savings on a citywide basis in health care costs in the NYC health care program.

   c. for fiscal year 2017 (July 1, 2016-June 30, 2017), there shall be $1 billion in savings on a citywide basis in health care costs in the NYC health care program.

   d. for fiscal year 2018 (July 1, 2017-June 30, 2018), there shall be $1.3 billion in savings on a citywide basis in health care costs in the NYC health care program.

   e. for every fiscal year thereafter, the savings on a citywide basis in health care costs shall continue on a recurring basis.

   f. The parties agree that the above savings to be achieved on a Citywide basis are a material term of this agreement.

   g. In the event the MLC does not agree to the above citywide targets, the arbitrator shall determine the UFT's proportional share of the savings target and, absent an agreement by these parties, shall implement the process for the satisfaction of these savings targets.

   h. Stabilization Fund: (1) Effective July 1, 2014, the Stabilization Fund shall convey $1 billion to the City of New York to be used in support of the pro rata funding of this agreement. (2) Commencing on July 1, 2014, $200 million from the Stabilization Fund shall be made available per year to pay for ongoing programs (such as $65 welfare fund contribution, PICA payments, budget relief). In the event the MLC does not agree to provide the funds specified in this paragraph, the arbitrator shall determine the UFT's proportional share of the Stabilization Fund monies required to be paid under this paragraph.

2. Dispute resolution regarding this section Q

   a. In the event of any dispute, the parties shall meet and confer in an attempt to resolve the dispute. If the parties cannot resolve the dispute, such dispute shall be referred to Arbitrator Martin F. Scheinman for resolution.

   b. Such dispute shall be resolved within ninety (90) days.

   c. The arbitrator shall have the authority to impose interim relief that is consistent with the parties' intent.

   d. The arbitrator shall have the authority to meet with the parties at such times as the arbitrator determines is appropriate to enforce the terms of this agreement.

e. The parties shall meet and confer to select and retain an impartial health care actuary. If the parties are unable to agree, the arbitrator shall select the impartial health care actuary to be retained by the parties.

f. The parties shall share the costs for the arbitrator and the actuary the arbitrator selects.

**R. Parking**

Provisions with respect to parking placards are contained in the letter agreement set forth in Appendix M.

## ARTICLE FOUR
## PENSION AND RETIREMENT
## PROGRAM

**A. Annuity Fund**

The Board shall contribute at the rate of $400 per year to the Teachers' Retirement System to be credited monthly to the annuity account of each teacher who is at the maximum step of his/her salary schedule.

The Board will seek such legislation as may be necessary to provide for these annuity contributions. In the event that necessary enabling legislation is not enacted, the Board will pay monthly to each teacher covered in the preceding paragraph at the rate specified above.

**B. Support for Program**

With respect to pensions and retirement, the Board hereby affirms its support of the following program:

1. One year of pension credit shall be granted for each 170 days of substitute service.

2. Teachers shall be entitled to credit for all teaching service in New York City or elsewhere rendered before entry into the Teachers' Retirement System of the City of New York.

3. The Teachers' Retirement Board should be adequately staffed to provide prompt and efficient service.

4. Teacher members of the Retirement Board shall be free from their teaching duties during their terms of office to be available for the education of teachers regarding their pension rights.

**C. Pension Legislation**

The parties have agreed to jointly support pension legislation as set forth in the letter attached as Appendix K.

**D. Tax Deferred Annuity Plan**

The parties agree to enroll newly-hired employees who do not enroll in a retirement or pension system maintained by the City of New York in the Board's 403(b) Annuity Plan at the time the employee is hired. It is further agreed that such employees will be provided with the option to withdraw from enrollment in the Board's 403(b) Annuity Plan.

**E. Pension Benefits Agreement and Deferred Compensation Plan**

1. The Pension Benefits Agreement dated June 6, 2000, is deemed to be a part of this Agreement.

2. The Board and the City shall promptly make available to the employees covered by this Agreement an eligible deferred compensation plan under Section 457 of the Internal Revenue Code in accordance with all applicable laws, rules and regulations.

## ARTICLE FIVE
## LICENSURE, ASSIGNMENT
## AND APPOINTMENT

### A. Substitute Teacher Position

It is the policy of the Board to provide for the gradual elimination of the position of substitute teacher in the following manner:

1. No examination for substitute teacher of common branches will be conducted at any time after September 1, 1968, and no license will be issued after February 1, 1969.

2. No examination for any other substitute teaching license will be conducted at any time after February 1. 1969, and no license will be issued after June 30, 1969.

The Board agrees that, in the event that the steps described in 1 and 2 above are not taken, it will pay to regular substitute teachers an additional sum calculated on the basis of the percentage of their annual salary which is equal to the percentage paid by the City of New York as increased take-home pay for its provisional employees but not to exceed the percentage paid to regular teachers. The Board will also treat regular substitute teachers for salary schedule placement and increment purposes in the same way as teachers who are appointed as regular teachers.

### B. Regularized Licensure

The Board of Education shall provide for the regular licensure of classroom teaching personnel consistent with the needs of the instructional program and subject to applicable law and the by-laws of the Board of Education. The Board will take the following actions:

The Board has established regular licenses valid for classroom teaching service under regular appointment, or for day-to-day per diem service, or for full-term assignment, or for other teaching service, including bi-lingual teaching. All teaching positions will be filled by persons holding such regular licenses except under the following circumstances:

1. Where a position must be filled to cover a class for which no person holding such regular license is immediately available after all efforts have been made to fill the position by a person holding such regular license;

2. Where the position covers a subject not normally taught in the public schools and is temporary in nature.

### C. Provisional Teachers

1. A Certified Provisional Teacher ("CPT") is a person who has not yet been appointed, who holds a New York State provisional or permanent certificate, a New York City regular license or a New York City substitute license issued on or before June 30, 1969. CPT's do not require annual renomination.

2. A Preparatory Provisional Teacher ("PPT") is a person who has not yet completed all the requirements for New York State provisional certification, but who holds a New York State temporary license. Pursuant to Commissioner's regulations, a PPT will be eligible for annual renomination for a state temporary license for a period of three years provided that for each year of service the PPT has been rated satisfactory and has shown

progress toward state provisional certification. For any PPT who satisfies these conditions the Chancellor will seek state renomination.

3. Appointments and assignments to teaching positions shall be made in accordance with State Education Law, Commissioner's regulations and applicable Board of Education regulations and provisions of this Agreement. Appointments shall be made from eligible lists of persons holding regular licenses. After all available persons with regular licenses have been appointed and where positions still remain vacant or arise during the course of the school term, certified provisional teachers shall have priority for any assignment. Where no certified provisional teacher is available for assignment, preparatory provisional teachers will be eligible for such assignment.

Except in cases of emergency, any CPT or PPT employed to fill a full term or balance of term assignment will be retained for at least the duration of that term.

**D. Assignment During First Fifteen Days**

A teacher who is assigned during the first fifteen (15) days of the school term to a position which is expected to be vacant for that term shall serve under the terms and conditions of this Agreement which would be applicable if a regular substitute teacher were serving in that position.

**E. Withdrawal of Resignation and Subsequent Reappointment**

1. Requests for withdrawal of resignation on the part of teachers who attained permanent tenure prior to their resignation shall be effectuated, subject only to medical examination and the approval of the Chancellor, provided that application for such withdrawal of resignation is made on or before the opening of school in September next following five years after the effective date of resignation. In all other cases of withdrawal of resignation, the requirements of former Section 255 of the Board of Education by-laws shall continue in effect.

2. Teachers who resign and subsequently are reappointed shall be placed in the salary step at which they were at the time of resignation and shall be given the sick leave "bank" and sabbatical leave rights which they held at the time of resignation.

**F. Absence Without Notice**

Teachers who are absent for 20 consecutive school days without notice shall be deemed to have resigned unless they have reasonable cause for failure to notify. The issue of the reasonableness of the cause and the penalty, if any, shall be subject to the grievance procedure, including binding arbitration, set forth in Article Twenty-Two.

**G. Return to Former License of Appointment**

To open more opportunities to serve in the New York City public schools, and to encourage the use of shortage area licenses, the parties have agreed to the following system for license reversion, which supplements the existing procedure. This new system requires application and approval to revert to a former license and appointment. Except in unusual cases, approval will not be given to change from a shortage to a non-shortage license area. However, pedagogues serving in agreed-upon shortage areas may apply under Section 248 of the Chancellor's Regulations to revert to a former license and appointment.

Except for pedagogues serving in agreed-upon shortage areas, pedagogues who have been previously appointed under different license(s) may apply to serve under any such license(s) according to the following guidelines: