teacher in the school to the class without regard to the program of the teacher so assigned. Assignment of teachers to cover classes in such emergency shall be made on a rotation basis to the extent possible.

5. Before involuntarily assigning any teacher, except a teacher who has had no coverage during the term, to cover a class, teachers will be assigned on an equitable basis from among all applicants who volunteer to cover the class during their preparation periods or professional activity periods. Licensure shall be taken into consideration in making coverage assignments. Implementation of this provision shall be in accordance with plans developed at the school level.

6. In secondary schools teachers who are assigned to cover classes during their preparation period or their professional activity period will be paid for such time at the rate set forth in paragraph 10 below for each such period in excess of one in any term during the applicable school year.

To the extent possible, the assignment of teachers to cover subject classes during their preparation period or professional activity periods shall be made on a rotation basis among teachers in license.

In elementary schools preparation periods shall not be taken away from classroom teachers except when an emergency arises. The unavailability of a teacher to cover a class constitutes an emergency. Teachers who lose preparation periods because of emergency will be paid for such time at the rate set forth in paragraph 10 below for each such period in excess of one in any term during the applicable school year.

When the normal school schedule is changed for a parent-teacher conference day when the teacher's pupils are not in school, a clerical half-day, a staff development program mandated by the community school district or central board when the teacher's pupils are not in school, or a standardized testing day, a teacher who performs such duties during the time he/she is scheduled to have a preparation period shall lose his/her preparation period and no compensation shall be due him/her under this provision except that in elementary schools a preparation period which was lost due to administering a standardized test shall be rescheduled within five school days.

7. Resource room teachers and speech improvement teachers will be treated equitably when involuntary assignments to emergency coverages are required to be made in the school.

8. A per diem substitute who is hired to cover the class of an absent teacher will be assigned to teach such teacher's class.

9. Any teacher removed from his/her professional assignment to cover a class will be entitled to be paid at the applicable coverage rate.

10. The coverage rate per period shall be:

Effective May 19, 2008.................................................... $35.29
Effective May 1, 2013......................................................... $35.64
Effective May 1, 2014......................................................... $36.00
Effective May 1, 2015......................................................... $37.09
Effective May 1, 2016......................................................... $38.38
Effective May 1, 2017......................................................... $40.13
Effective May 1, 2018......................................................... $40.92
Effective June 16, 2018........................................................ $42.15

## O. Shortage License Areas

The Board has informed the Union of the steps it has taken and is continuing to take to minimize or eliminate teacher shortages in particular license areas. Notwithstanding these steps, the parties agree that Citywide shortages of regularly licensed teachers exist in particular licenses (shortage license areas). Therefore, the parties have adopted the following provisions in a mutual effort to address shortages of teachers in shortage license areas:

1. In accordance with applicable regulations, at each reorganization the Chancellor may authorize a particular school, where a vacancy exists in a shortage license area which the Division of Human Resources has been unable to fill, to fill the position pursuant to these provisions.

2. If the school is so authorized to fill the position hereunder, teachers in the school who are regularly licensed and appointed in the shortage license area may apply for a program in which they teach up to five regularly scheduled periods per week beyond the applicable contractual maximum teaching load in lieu of preparation time to which they would otherwise be entitled. For purposes of implementing these provisions, the "applicable contractual maximum" teaching loads shall be those specifically set forth in this Agreement. The applications of such teachers shall be granted in order of their seniority.

3. If, at any reorganization period, no teacher regularly licensed and appointed in the shortage license area applies to fill a position authorized hereunder, the position may be offered to other teachers in the school in the following order:

(1) Regularly appointed with certification in the license area;

(2) Provisional with certification in the license area;

(3) Regularly appointed with experience teaching in the license area;

(4) Provisional with experience teaching in the license area.

Within each category listed above, the applications of such teachers shall be granted in order of their seniority.

4. At the next reorganization, the available assignments hereunder, if any, shall be rotated (within each category) by following the same procedure. Accordingly, it is the intent of the parties that coverages will be equitably distributed over successive reorganizations and implementation of these provisions shall not modify any of the provisions of Article 7N.

5. Teachers scheduled to teach in lieu of preparation time as set forth above shall be paid at the rates set forth below per semester as a "special per session payment" if they are scheduled to teach five periods per week in lieu of preparation time:

| | |
|---|---|
| Effective May 19, 2008 | $5,660 |
| Effective May 1, 2013 | $5,717 |
| Effective May 1, 2014 | $5,774 |
| Effective May 1, 2015 | $5,948 |
| Effective May 1, 2016 | $6,156 |
| Effective May 1, 2017 | $6,436 |
| Effective May 1, 2018 | $6,562 |
| Effective June 16, 2018 | $6,759 |

Teachers who are scheduled to teach fewer than five periods per week in lieu of preparation time or who are scheduled to teach less than a full term shall receive a pro-rata "special per session payment" hereunder.

6.  These provisions shall not be implemented in any school where an excessing situation would be caused by their implementation.

7.  The decision of the Chancellor not to authorize implementation of these provisions in a shortage license area in a particular school shall be final and not subject to grievance.   However, all other aspects of these provisions shall be subject to the grievance and arbitration provisions of this Agreement.

8.  Should salary credit regulations be revised in order to recruit personnel in shortage license areas, incumbent employees will be treated equitably.

**P.  Regular Part-Time Assignments for Appointed Teachers**

1.  A limited number of regularly appointed teachers (including teachers on unpaid leaves) may be assigned to less than full-time positions where such an assignment meets a particular need of the school system, including, but not limited to, filling a vacancy where no full-time teacher is available, alleviating a shortage area, serving in the Mentor/Intern Program or sharing a full-time position with another teacher on unpaid leave.   The number of these positions in any school year will be decided jointly by the Board and the Union and awarded on the basis of agreed-upon criteria.

2.  Teachers in these positions will be entitled to full health and welfare benefits and pro rata salary (including vacation pay) and pro rata sick leave.

3.  Service performed in this program shall be considered for all seniority and salary credit consistent with current Board policy.

4.  The Board and the Union shall seek appropriate legislation, where necessary to secure pension rights.

5.  Teachers in these positions will be treated equitably in the assignment of preparation periods and other program requirements.

6.  The following provisions shall apply: Article One, Two, Three, Four, Five, Seven, Eight, Nine, Ten, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, Twenty-Six, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty, Thirty-One, and Thirty-Two.

**Q.  Conferences**

1.  School conferences held in September and June shall be held on school time.

2.  No more than one Citywide conference on school time for the entire faculty of teachers of the homebound will be held during the school year.

3.  In any one borough, no more than two borough-wide conferences for teachers of CRMD will be held after school hours during any school year.

4.  During any school year, no more than three borough-wide conferences for teachers of health conservation will be held after school hours in any borough.

5.  Regular monthly conferences of teachers of speech improvement will be held on school time in September and June. Other regular conferences will begin at 3:00 p.m.

6.  Faculty conference agendas shall be set in consultation with the UFT chapter committee.

**R. Basic Instructional Supplies**

**1. Supplies and Books**

The Board and the Union agree that schools should provide appropriate and sufficient basic instructional supplies and books to deliver an effective educational program. Basic instructional supplies and books are those that must be provided for use by students without which classroom instruction will be impaired.

In the event a member or members of the faculty believe that such supplies and books are not available to students and faculty, the chapter may request a meeting with the principal. Upon the request of the chapter leader, the principal shall meet with the UFT chapter committee to resolve the issue. If no resolution is achieved at the school level, the district representative and the appropriate superintendent will meet within five (5) school days to attempt to resolve it. If they are unable to do so, the dispute will be forwarded by the Union to the Chancellor for his/her prompt review and response.

**2. Curriculum**

The Board of Education (DOE) agrees to provide teachers with either a year-long or semester long Curriculum that is aligned with State Standards in all Core Subjects.

Curriculum is defined as:

a) a list of content and topics;

b) scope and sequence; and

c) a list of what students are expected to know and be able to do after studying each topic.

Core Subjects are defined as follows: Math (including, but not limited to, Algebra and Geometry), Social Studies, English Language Arts, Science (including, but not limited to, General Science, Biology, Earth Science, Chemistry and Physics), Foreign Languages and other subject areas named by the DOE and shared with the UFT. It is understood that the DOE's obligation to provide curriculum shall extend to Core courses that may be electives.

It is further understood by both parties that there are instances where teachers may want to participate in the development of curriculum. Such instances include, but are not limited to, the creation of new themed schools or programs within a school, or where a teacher or group of teachers wishes to create or help create a set of lessons around a particular theme or subject, where approved by the principal. Nothing in this agreement is intended to prohibit voluntary collaboration or work by teachers and other school staff on curriculum.

However, if there is a specific request by the DOE or a school administrator for a teacher or teachers to write curriculum, then the teacher(s) must be given sufficient time during the work day to do so, in accordance with provisions of the collective bargaining agreement or given sufficient time after school, in accordance with the provisions of the collective bargaining agreement pertaining to Per Session.

The failure to provide curriculum as defined above shall be subject to the grievance and arbitration procedures set forth in Article Twenty-Two of the collective bargaining agreement. However, such grievances shall be strictly limited to whether a curriculum, as defined above, was provided. The sufficiency and quality of the curriculum provided shall not be grievable.

**S. Additional Facilities**

1. Adequate supplies will be made available in teacher washrooms in schools.

2. Pay telephone facilities in schools will be made available to teachers for their reasonable use.

3. In schools where continuous cafeteria service for teachers is not available, a vending machine for beverages shall be installed at the request of the particular school staff.

4. Teaching materials and workbooks shall be made available to teachers of the homebound at a central stock room on an emergency basis.

5. The Board shall issue parking display cards to identify automobiles of teachers of the homebound visiting homebound children. Additional provisions with respect to parking placards are contained in the letter agreement set forth in Appendix M.

6. The Board will make every effort to obtain parking privileges for special education teachers. Additional provisions with respect to parking placards are contained in the letter agreement set forth in Appendix M.

**T. Teleconferencing**

The required participation of special education teachers and/or related service providers in EPCs and CSE reviews may be accomplished via teleconferencing at the discretion of the appropriate Superintendent. If the teleconference occurs during a teacher's preparation period, or during an administrative period in which he or she is relieved, compensation will be paid at the coverage rate. If the teleconference occurs on other than school time, compensation at the applicable per session rate will be paid.

**U. Professional Activity Assignment Procedures**

1. The number of available positions for each professional activity and the qualifications and responsibilities required for each activity shall be set by the principal in consultation with the Chapter Leader. Each spring, but no later than April 15th, the principal shall meet to consult with the Chapter Leader on the number of positions for each menu item. Should the Union believe the number of positions for administrative activities set by the principal is inappropriate, or should a teacher believe a selection decision is in violation of the Agreement, the Union may appeal to the Chancellor. The Chancellor or his/her designee will consult with the Union President, or his/her designee, prior to issuing a decision on the appeal. The Union may appeal the decision of the Chancellor or his/her designee within 15 days to the NYC Office of Labor Relations, which will issue a final and binding decision.

2. Teachers shall select each spring (following the timeframe for program preferences listed under Articles 7A, 7B, 7C, and 7K in this Agreement) in priority order, three (3) activities from the menu they want to participate in for the following school year. The principal shall make assignments based on qualifications and availability of positions. If more teachers seek particular activities than positions are available, the principal shall select the most qualified teacher(s); and if the candidates are equally qualified the candidate with the most school seniority will be selected. To the extent possible each teacher shall receive one of the three (3) activities for the following school year. If this is not possible, the teacher will be given the opportunity to select three (3) additional choices, one of which will be granted, subject to qualifications, and unless sufficient teachers do not choose a particular activity. If sufficient teachers do not choose a particular activity with any of their six (6) choices, the Principal will assign teachers to these activities on a rotational basis in inverse seniority order with no teacher being involuntarily assigned to an administrative activity for consecutive years.

3. Teachers new to the school system and those teachers in danger of receiving an unsatisfactory rating may be assigned by the principal to professional development or common planning as their professional activity, regardless of their preferences, to further enhance their teaching skills. A teacher in danger of receiving an unsatisfactory rating who is assigned to AM or PM bus duty may be assigned by the principal to professional development or common planning as their professional activity in lieu of AM or PM bus duty. Teachers hired in the fall will be offered three choices by the principal from the menu.

4. Each teacher shall be notified in writing by the principal prior to the end of the school year, pursuant to Articles 7A, 7B, 7C, and 7K of the activity they have been assigned for the following school year and it will be incorporated as part of his/her program.

5. Teachers serving in compensatory time positions, pursuant to the SBO process (defined in Articles 7A, 7B, 7C and 7K and Circular 6) shall continue to do the work of their position during their professional periods (except to the extent the SBO specifically states otherwise) and must at the beginning of each term submit to the principal for approval a plan for the use of their professional periods.

6. Teachers serving as athletic coaches, pursuant to Article 15 of this Agreement, and receiving per session pay for such activity, shall be permitted to use their professional periods to further the work of their activity, and must at the beginning of each term, submit to the principal for approval a plan for the use of their professional periods.

7. Any teacher may grieve the failure to follow the terms of this provision pursuant to the regular grievance and arbitration provision of this Agreement. However the assignment of particular activities hereunder shall not be grievable. The Union may challenge the assignment of a particular activity by appealing, within 15 days, to the Chancellor/designee, who will consult with the Union prior to rendering a decision. The Union may appeal the decision of the Chancellor/designee to the New York City Office of Labor Relations, which will issue a final and binding decision.

## V. Regular Payroll Status for Per Diem Substitutes

1. The Board ("Department") will pay on the regular payroll (i.e. Q payroll) any per diem substitute provided that he/she either:

(A)(i) was employed by the Department to replace a regularly appointed teacher who is in a Vacancy (as defined herein); (ii) commenced employment later than the fifteenth calendar day following the first day for the reporting of newly appointed teachers; and (iii) was employed for a minimum of two months; or

(B)(i) was employed by the Department to cover a Vacancy; and (ii) commenced employment during the first fifteen calendar days of the term.

2. For purposes of this section, a Vacancy is a position that is filled by a substitute teacher under the following circumstances:

(A) there is no regular appointed teacher and the position is an unencumbered vacancy; or

(B) when the regularly appointed teacher is (a) on a sabbatical leave of absence for the full term or full school year; (b) on an unpaid leave of absence for the duration of the school year; (c) on an approved leave due to an injury in the line of duty ("ILOD") and the ILOD leave is for the duration of the school year; (d) reassigned for the duration of

the school year, however the substitute teacher shall not receive regular payroll status (i.e. Q payroll) for the first sixty (60) days of service in this assignment; (e) absent on paid status (i.e. using their Accumulated Absence Reserve (CAR), or borrowing up to 20 additional CAR days and/or utilizing the grace period) and whose status is subsequently adjusted to unpaid leave status for the duration of the school year; or (f) on an approved paid absence (i.e. using their CAR days and/or utilizing the grace period) for the duration of the school year.

    3.  In the event a substitute does not work in the assignment for the duration of the school year (except in the case of a sabbatical for one term as described above in (3)(2)(a)), s/he shall not be entitled to regular payroll status (i.e. Q payroll).

    4.  The foregoing shall supersede and replace Chancellor's Regulation C-525 with respect to the criteria necessary to attain regular payroll status (i.e. Q payroll).

    5.  Pursuant to Chancellor's Regulation C-520, a substitute teacher shall be entitled to Z status if s/he replaces a particular absent employee for thirty (30) or more consecutive work days.  The terms of Chancellor's Regulation C-520 shall remain in effect with respect to Z status; to the extent C-520 addresses regular payroll status (i.e. Q payroll) and is inconsistent with this Stipulation, the terms of this Stipulation shall be determinative.


## ARTICLE EIGHT
## EDUCATION REFORM

### A. School-Based Management/Shared Decision-Making (SBM/SDM)

    The Union and the Board agree that SBM/SDM is a process in which all members of the school community collaborate in identifying issues, defining goals, formulating policy and implementing programs.  The uniqueness of each school community requires that the SBM/SDM process and the organizational and instructional issues discussed are determined by the staff, parents, administration and students (where appropriate) at individual schools through the SBM/SDM team.  The Union and the Board agree that in order to achieve SBM/SDM at the school level significant restructuring of instruction must occur, and the parties agree to work cooperatively in an effort to bring about these changes.

    **1. Eligibility and Involvement**

    a.  All schools are eligible to apply for participation in SBM/SDM.  School participation shall be voluntary and subject to approval by fifty-five (55) percent of the voting, non-supervisory school based staff (e.g., teachers, paraprofessionals, support staff and others) and agreement of the principal, the appropriate superintendent and parents.  Similarly, schools involved in SBM/SDM may choose to opt out of the program at any time.  The decision to opt out shall be voluntary and subject to approval by at least fifty-five (55) percent of the voting, non-supervisory school based staff.

    b.  All votes of non-supervisory school based staff concerning participating in SBM/SDM shall be conducted by the UFT chapter.

    c.  Schools involved in SBM/SDM shall conduct ongoing self-evaluation and modify the program as needed.

**2. SBM/SDM Teams**

a.  Based upon a peer selection process, participating schools shall establish an SBM/SDM team.  For schools that come into the program after September 1993, the composition will be determined at the local level.  Any schools with a team in place as of September 1993 will have an opportunity each October to revisit the composition of its team.

b.  The UFT chapter leader shall be a member of the SBM/SDM team.

c.  Each SBM/SDM team shall determine the range of issues it will address and the decision-making process it will use.

**3.  Staff Development**

The Board shall be responsible for making available appropriate staff development, technical assistance and support requested by schools involved in SBM/SDM, as well as schools expressing an interest in future involvement in the program.  The content and design of centrally offered staff development and technical assistance programs shall be developed in consultation with the Union.

**4.  Waivers**

a.  Requests for waivers of existing provisions of this Agreement or Board regulations must be approved in accordance with the procedure set forth in Article Eight B (School-Based Options) of this Agreement i.e. approval of fifty-five (55) percent of those UFT chapter members voting and agreement of the school principal, UFT district representative, appropriate superintendent, the President of the Union and the Chancellor.

b.  Waivers or modifications of existing provisions of this Agreement or Board regulations applied for by schools participating in SBM/SDM are not limited to those areas set forth in Article Eight B (School-Based Options) of this Agreement.

c.  Existing provisions of this Agreement and Board regulations not specifically modified or waived, as provided above, shall continue in full force and effect in all SBM/SDM schools.

d.  In schools that vote to opt out of SBM/SDM, continuation of waivers shall be determined jointly by the President of the Union and the Chancellor.

e.  All School-Based Option votes covered by this Agreement, including those in Circular 6R, shall require an affirmative vote of fifty-five percent (55%) of those voting.

**B.  School-Based Options**

The Union chapter in a school and the principal may agree to modify the existing provisions of this Agreement or Board regulations concerning class size, rotation of assignments/classes, teacher schedules and/or rotation of paid coverages for the entire school year.  By the May preceding the year in which the proposal will be in effect, the proposal will be submitted for ratification in the school in accordance with Union procedures which will require approval of fifty-five (55) percent of those voting. Resources available to the school shall be maintained at the same level which would be required if the proposal were not in effect.  The Union District Representative, the President of the Union, the appropriate Superintendent and the Chancellor must approve the proposal and should be kept informed as the proposal is developed.  The proposal will be in effect for one school year.

Should problems arise in the implementation of the proposal and no resolution is achieved at the school level, the District Representative and the Superintendent will attempt to resolve the problem.  If they are unable to do so, it will be resolved by the

Chancellor and the Union President. Issues arising under this provision are not subject to the grievance and arbitration procedures of the Agreement.

## C. School Allocations

Before the end of June and by the opening of school in September, to involve faculties and foster openness about the use of resources, the principal shall meet with the chapter leader and UFT chapter committee to discuss, explain and seek input on the use of the school allocations. As soon as they are available, copies of the school allocations will be provided to the chapter leader and UFT chapter committee.

Any budgetary modifications regarding the use of the school allocations shall be discussed by the principal and chapter committee.

The Board shall utilize its best efforts to develop the capacity to include, in school allocations provided pursuant to this Article 8C, the specific extracurricular activities budgeted by each school.

The Board ("Department") shall provide to the Chapter Committee and Chapter Leader in school the School Leadership Team (SLT) view of the Galaxy Table of Organization. This shall be supplied before the end of June each school year and again by the opening of school in September of each school year.

In addition, should there be any budget modification regarding the use of school allocations, these shall be discussed by the Principal and Chapter committee. In order to facilitate such discussion, the modifications shall be provided to the Chapter Committee.

## D. Students' Grades

The teacher's judgment in grading students is to be respected; therefore if the principal changes a student's grade in any subject for a grading period, the principal shall notify the teacher of the reason for the change in writing.

## E. Lesson Plan Format and Unit Planning

The development of lesson plans by and for the use of the teacher is a professional responsibility vital to effective teaching. The organization, format, notation and other physical aspects of the lesson plan are appropriately within the discretion of each teacher. A principal or supervisor may suggest, but not require, a particular format or organization, except as part of a program to improve deficiencies of teachers who receive U-ratings or formal warnings.

A "Unit Plan," also known as a "Curriculum Unit," means a brief plan, by and for the use of the teacher, describing a related series of lesson plans and shall include: (1) the topic/theme/duration; (2) essential question(s); (3) standard(s); (4) key student learning objectives; (5) sequence of key learning activities; (6) text(s) and materials to be used; and (7) assessment(s).

Teachers that are provided with a Curriculum (as defined in this Agreement) have a professional responsibility to prepare Unit Plans. No teacher shall be required to prepare a Unit Plan for each curriculum unit, other than the attached, brief, one-page form agreed upon by the UFT and DOE, including teachers of multiple subjects for the same group of students (e.g., elementary school teachers, teachers of self-contained classes), who will include each subject taught on the attached one page form. Teachers shall not be required to prepare a Unit Plan in any format other than the form attached as Appendix P, agreed upon by the UFT and DOE.

A principal or supervisor may collect and/or copy a Teacher's Unit Plan provided that the principal/supervisor either (i) discusses the Unit Plan at the next professional

conference (*e.g.,* pre-observation or post-observation conference) pursuant to the observation cycle or as otherwise permitted by the parties' APPR plan, or (ii) uses the Unit Plan for professional learning (*e.g.,* non-evaluative conferencing with the principal or other administrators) within twenty (20) school days of the collection or copying, absent unforeseen and unusual circumstances.

**F. Joint Efforts**

The Board of Education and the Union recognize that a sound educational program requires not only the efficient use of existing resources but also constant experimentation with new methods and organization. The Union agrees that experimentation presupposes flexibility in assigning and programming pedagogical and other professional personnel. Hence, the Union will facilitate its members' voluntary participation in new ventures that may depart from usual procedures. The Board agrees that educational experimentation will be consistent with the standards of working conditions prescribed in this Agreement. The Board and the Union will continue to participate in joint efforts to promote staff integration.

The parties will meet with a view toward drafting their collective bargaining agreements to reflect and embody provisions appropriate to the new and/or nontraditional school program organizational structures that have developed in the last several years, including as a result of this Agreement.

**G. Professional Support for New Teachers**

The Union and the Board agree that all teachers new to the New York City Public Schools are entitled to collegial support as soon as they commence service. The New Teacher Staff Development Program and Mentor Teacher-Intern Program provide this support, enabling new teachers to expand their range of instructional skills and strategies, and to become actively involved in the life of their school.

**1. New Teacher Staff Development Program**

a. For uncertified teachers without prior teaching experience there will be ten (10) mandatory days of staff development. Five (5) of these days will take place in the summer prior to the new teacher's employment and the remaining five (5) will take place during the teacher's first year of service.

b. For certified teachers without prior teaching experience there will be five (5) mandatory days of staff development. Three (3) of these days will take place in the summer prior to the new teacher's employment and the remaining two (2) will take place during the first year of teaching.

c. For teachers who have three (3) or more years of approved outside teaching experience there will be three (3) mandatory days of staff development in the summer prior to the new teacher's employment.

d. Uncertified teachers without prior teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment and will be required to complete one (1) day for each remaining two (2) months of the school year.

e. Certified teachers without prior teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment and will be required to complete one (1) day for each remaining two (2) months of the school year up to a maximum of two (2) days.

f. Teachers who have three (3) or more years of approved outside teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment.

g. The content and design of this professional development program for new teachers shall be developed collaboratively by the Union and the Board and will take into account varying needs of new teachers based upon their educational and professional backgrounds. As an additional option the Union and the Board agree to develop criteria for college courses that can be credited toward fulfillment of the first year professional development requirement in order to coordinate services and requirements for new teachers.

h. There shall be an expense stipend for each day of mandatory professional development for new teachers paid at the rate per day set forth below:

Effective May 19, 2008.................................................... $40.20
Effective May 1, 2013....................................………….. $40.60
Effective May 1, 2014........................................………… $41.01
Effective May 1, 2015........................................………… $42.25
Effective May 1, 2016........................................………… $43.72
Effective May 1, 2017........................................………… $45.71
Effective May 1, 2018........................................………… $46.61
Effective June 16, 2018......................................………… $48.01

Provisions for payment of this stipend shall not apply to persons opting for the above mentioned college courses.

## 2. Mentor Teacher Intern Program

a. The Mentor Teacher Intern Program is designed to improve instruction for children in the New York City Public Schools by supporting the development of beginning teachers. At the core of the program is the relationship that develops between the skilled, experienced teacher (mentor) and the uncertified colleague (intern). This relationship provides a forum for the uncertified teacher to identify issues that form the basis of his or her professional development. For the mentor, it provides the opportunity to share years of accumulated skills and experience.

b. In accordance with state law and regulations: time will be provided for mentor-intern interaction; information shared between the mentor and the intern must remain confidential; and the building principal/supervisor does not rate teachers in their role as mentor or intern. Specific details will be jointly agreed upon by the Union and the Board.

c. All mentors are required to teach a minimum of one (1) period daily. Mentors are selected and matched to one (1) or more intern(s) by the Mentor Advisory Selection Committee. Full-time mentors serving in more than one building shall maintain seniority and the right of return to the site in which they previously served.

d. The Mentor Advisory Selection Committee is a 12 member committee with a majority of teachers who are selected by the Union. Its responsibilities include setting policy with regard to the Mentor Teacher-Intern Program, selecting mentors for recommendation to the appropriate superintendent, matching mentor-intern teams, requesting variances and coordinating district staff development for mentors and interns. The committee selects its chairperson through consensus. Operating procedures for the Mentor Advisory Selection Committee shall be jointly determined by the Union and the Board.

e.   The assignment of a mentor to an intern shall be made at the commencement of service but no later than the 20th day of service to the maximum extent possible. Exceptions will be made for those whose service commences after agreed upon dates, annually determined by the Union and the Board.

f.   All newly hired, uncertified teachers who do not possess the minimum number of education credits and student teaching/required experience necessary for a regular license shall participate in the Mentor Teacher-Intern Program for one (1) year.  This program shall be provided by a mentor.

The parties will jointly request on an annual basis a waiver of State Education Commissioner's Regulation 80.18 to offer in satisfaction of the State Mentoring requirement for uncertified teachers a cost effective, substantive, high quality, professional development program as provided in Special Circular No. 14, 1992-93 dated September 30, 1992.

g.   A mentor is a skilled, experienced colleague who has chosen to share his or her expertise by assisting the intern.  A mentor has five (5) or more years experience and possesses permanent certification in the same or related license area as the intern. Preference in selecting mentors may be given to teachers who have served three (3) of the last five (5) years in their present school.  Teachers who have transferred through the UFT Transfer Plan or teachers who have been excessed into the school may use previous school experience to qualify for three (3) years in the current school.

h.   The Union and the Board agree to collaboratively develop a professional development program for mentors.

### 3.   Professional Support Periods and Assignments

a.   Guidelines for the use of professional support periods for new teachers will be established.  Under the direction of the principal, their use will include but not be limited to activities supportive of upgrading instruction such as: observation of classes conducted by experienced teachers, consultation with others familiar with such areas as instructional strategies in the classroom, planning, curriculum and behavior management.

b.   During the first year of employment of a teacher who has not had previous professional employment as a teacher, two preparation periods per week shall be designated as professional support periods.

c.   For uncertified teachers being mentored during their second year of employment, two preparation periods per week shall continue to be designated as professional support periods exclusively for the purpose of mentoring.

d.   During the first year of employment, a new teacher will be exempt from the generally applicable policy of rotation of teaching assignments.  If the number of new teachers makes it impractical to apply this provision, an alternative to this approach may be implemented if jointly approved by the Board and the Union.  Guidelines for this purpose will be issued by the Chancellor after consultation with the Union.  New teachers may not volunteer or be assigned to coverages during their professional activity periods.

### H.  Professional Development and Second Differential

As one aspect of the parties' interest in professional development, a joint Board-Union committee comprised of three (3) designees of the UFT President and three (3) designees of the Chancellor was established to expand and professionalize available staff development opportunities.    As a priority, the joint committee focused on new professional development opportunities for teachers seeking their second differential, and

for other pedagogues seeking a comparable differential, and made its initial recommendations to the Chancellor. It is the intention of the parties to make such opportunities available to staff at no or modest cost, and with no additional cost to the employer. The Chancellor may establish limits on the number of these credits which can be earned per term toward the second differential via this professional development initiative (the P-credit program). It is understood that the Chancellor's decisions about all aspects of the Committee's recommendations, the design of the P-credit program and regulations for implementation of the P-credit program shall be final and binding on the parties and not subject to the grievance process. Any claim concerning the arbitrary, capricious and/or discriminatory application of such regulations to individuals will be grievable and arbitrable.

## I. Reduction of Paperwork

(1) A Central Paperwork Committee (the "Central Committee") will convene within thirty (30) days of the ratification of this agreement by the UFT. The Central Committee will be made up of an equal number of representatives appointed by the UFT President and the Chancellor. The representatives appointed by the Chancellor will include someone from the office of the Deputy Chancellor for Teaching and Learning. The Central Committee will meet at least monthly, on the first Wednesday of the month or at a mutually agreeable time, to review system-wide paperwork issues (whether paper or electronic), including, but not limited to, the requests for data in connection with the Quality Review process. The Central Committee will also establish, subject to agreement by the Chancellor and the UFT President, system-wide standards for the reduction and elimination of unnecessary paperwork ("System-wide Standards"). Should the Central Committee fail to establish System-wide Standards approved by the Chancellor within sixty (60) days of their first meeting, either the UFT or the Board (DOE) may request the assistance of a member of the Fact-Finding Panel of Martin F. Scheinman, Howard Edelman and Mark Grossman, or another mutually agreeable neutral, to help facilitate the Central Committee's discussions. Should the intervention of a neutral not result in an agreement by the Central Committee approved by the Chancellor within sixty (60) days of the neutral's involvement, the DOE and UFT will submit position statements to said neutral who will issue a binding decision. The neutral's decision setting the System-wide Standards shall be subject to Article 75 of the New York State Civil Practice Law and Rules.

(2) Once the System-wide Standards have been established they will be distributed to all schools and key stakeholders (including SLT Chairpersons, PA/PTA Presidents, UFT Chapter Leaders, UFT District Representatives, District Superintendents and CSA Representatives). Thereafter, District/High School Superintendency Paperwork Committees ("District Committees") shall be established in each community school district and high school superintendency. The District Committees shall meet monthly, at a regularly scheduled time, for the purpose of addressing paperwork issues (whether paper or electronic) at the school level and to ensure the System-wide Standards are being implemented properly in schools. These District Committees will be made up of an equal number of representatives appointed by the UFT President and the Chancellor. The representatives appointed by the Chancellor shall include the District/High School Superintendent or his/her designee.

(3) Employees (including those in functional chapters) may request that their Chapter Leader raise school-specific paperwork issues (whether paper or electronic) before the District Committee.  Subject to approval by the Chancellor, if a District Committee agrees on the resolution of the paperwork issue, the resolution shall be enforced by the District or High School Superintendent.  In the event that a District Committee cannot agree on the resolution of an issue raised by a Chapter Leader of an individual school, the District Committee shall refer the issue to the Central Committee for review. Subject to approval by the Chancellor, if the Central Committee agrees on the resolution of an issue raised by a Chapter Leader, the resolution shall be enforced by the District or High School Superintendent.

(4) For alleged violations of the System-wide Standards the UFT may file a grievance, in accordance with the grievance and arbitration procedures set forth in Article 22 of this Agreement. It is understood that, prior to a grievance being filed, the paperwork issues shall go through the committee process as described above. Such grievances shall be filed directly with the DOE's Office of Labor Relations ("OLR"), which may be scheduled for arbitration within twenty (20) days of notice to OLR. The parties shall negotiate pre-arbitration hearing procedures so that each party is aware of the allegations and defenses being raised at the arbitration. All arbitration days shall be part of the existing number of days as set forth in this Agreement.  An arbitrator may hear up to three (3) paperwork grievances on each arbitration date.  The arbitrator will issue a brief award that is final and binding upon the parties, within five (5) school days of the arbitration.

## J.  Evaluation and Observation System

### 1.  Teachers Not Subject to the APPR Plan Required By Education Law §3012-c

a.   The UFT and the Board of Education are committed to attracting and retaining the most competent staff.  To this end the Union and the Board established a joint committee which undertook a study to develop and design a high quality prescriptive evaluation and professional growth system that would give each staff member choices and a role in his/her professional growth.

Following the study, the Union and the Board agreed upon such a system.  The parties' full agreement is embodied in the document entitled "Teaching for the 21st Century" and the attachments thereto, which is the definitive document regarding the evaluation/observation plan.   Under that plan, performance reviews are based on assessment/evaluation procedures which identify and recognize the range of abilities and experiences of teachers and link a teacher's performance, a school's educational goals and related professional development activities.   The reviews must be based on the agreed upon characteristics of good teaching, including consideration of positive student learning outcomes and parent involvement.

b.   The plan also provides the following:

(1) Where appropriate, the performance review must include clear and specific recommendations for professional growth.

(2) Annual performance reviews may be based on either of two models:

The first model, known as Annual Performance Options (Component A), offers an individual teacher, in consultation with his/her supervisor, the opportunity to set yearly goals and objectives and to choose the methods for demonstrating professional growth.