UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

REYNA ARROYO,

                Plaintiff                    DOCKET NO. 19-CV-7416 (ER)

    -against-

THE DEPARTMENT OF EDUCATION OF THE CITY
OF NEW YORK,

                Defendant

————————————————————————x


# PLAINTIFF'S OPPOSITION TO DEFENDANT'S
# MOTION TO DISMISS




**Reyna Arroyo**
**Plaintiff Pro Se**
**651 Tilden Avenue**
**Teaneck, N.J. 07666**

**646-685-7703**

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………2

STATEMENT OF FACTS…………………………………………………………5

ARGUMENT……………………………………………………………………30

    POINT I: PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE
        DOCTRINES OF COLLATERAL ESTOPPEL OR RES
        JUDICATA………………………………………………...........34

    POINT II: THE FIRST AMENDMENT RETALIATION CLAIM
        IS VALID…………………………………………………..41

    POINT III: PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS
        MUST CONTINUE……………………………………………43

    POINT IV: THE COURT SHOULD EXERCISE SUPPLEMENTAL
        JURISDICTION…………………………………...........................49

    CONCLUSION……………………………………………………………49

# TABLE OF AUTHORITIES

Aetna Ins. Co. v. Kennedy, 301 U. S. 389, 393 (1937) ………………………………18

Breithaupt v. Abram, 352 U.S. 432,435 (1957)……………………………………..30

Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d.

Cir. 2005)………………………………………………………………………40

Cardinale v NYC Department of Education, Index No. 85165/2017 (March, 2018)…… 33

Carnley v. Cochran, 369 U. S. 506 (1962)……………………………………………..38

Cioffi v. Averill Park C nt. Sch. Dist., 444 F.3d 158, 164………………………………… 43

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985]…………………….39

Cty. of Sacramento v. Lewis, 523 U.S. 833, 847  (1998)……………………………..48

Davis v. Goord, 320 F.3d 346, 354 (2d Cir.2003)……………………………………44

Dwares v. The City of New York, 985 F.2d 94, 100 (2d Cir. 1992)……………………44

Education Law §2590-h……………………………………………………………………….9

Education Law§§§ 3012, 3012- a………………………………………………………………..39

Education Law §3020-a(2)(a)………………………………………………………………….. 6

Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008)……………………………. 46

Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009)…………………………………….45

Faulks v. City of Hartford. 2010 WL 259076.(2010)…………………………………...46

Fierro v. New York City Dep't of Educ., 994 F. Supp. 2d 581, 592-93 (S.D.N.Y. 2014)   .47

Garcetti v. Ceballos, 547 U.S. 41O (2006)……………………………………… ……43

Gentile v. Nulty. 769 F. Supp. 2d 573, 583 (S.D.N.Y. 2011)……………………………. . 46

Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d
 274,654 N.E.2d 95 [1995]…………………………………………………………… 37

Holt v. Board of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625 [1981]………. 39

Jackler v. Byrne 658 F.3d 225 (2nd Cir. 2011)……………………………………… 44

Johnson v. Zerbst, 304 U. S. 458, 464 (1938)……………………………………………38

Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251-52 (2d Cir. 2001)………….48

Lewis v. Cowen, 165 F.3d 154, 163 (2nd Cir. 1999)…………………………………….43

Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003)………………………….45

Massaro v. New York City Dep 't of Educ., 2012 U.S. App. LEXIS 10911 (2d. Cir. May 31,
2012)……………………………………………………………………………………..42

Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46 NY2d 450…..38

Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 81 NY2d 446…………..38

Matter of Schumer v. Holtzman, 60 N.Y. 2d 46,51…………………………………….. 40

Matthews v. City of New York, 488 Fed Appx. 532, 533 (2nd Cir. 2012)………………..44

Moore v. County of Suffolk, 851 F.Supp.2d 447,458 (E.D.N.Y. 2012)……………… 49

Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999)…………………………………….44

Mosdos Chofetz Chaim. Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679,697

(S.D.N.Y. 2011)...........................................................................47

Mudge v. Zugalla, 2014 WL 2453353, at *8 (N.D.N.Y. June 2, 2014).........................47

New York State Open Meetings Law Section 105............................................9

Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U. S. 292, 307 (1937)......................38

Pickering v. the Board of Education of Township High School, 391 U.S. 589 (1968)....43

Plyler v. Doe, 457 U.S. 202, 216 (1982)................................................ 46

Posr v. Court Officer Shield # 207, 180 F.3d 409, 418 (2d Cir.1999)...........................45

Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., _F.Supp.2d_, (2014 WL
   3547374............................................................................44

Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001).....................45

Ross v. Breslin, 693 F. 3d 300 (2nd Cir., 2012)..............................................42, 43

Shekhem' El-Bey v. City of New York. 419 F.Supp.2d 546, 552 (S.D.N.Y.2006)...............44

Singh v. City of New York, 524 F3d. 361,372 (2nd Cir. 2008)..................................43

Sloup v. Loeffler, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. 2008)............................46

Sousa v. Roque, 578 F.3d 164, 170 (2d. Cir. 2009)..........................................42

U.S. v. Wells, 347 F.3d 280, 285 (8th Cir. 2003)..............................................35

Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013).........47

Weintraub v. Bd. of Educ., 593 F. 3d 196,202 (2nd Cir. 2010)..................................43

Woodlock v. Orange Ulster B. 0. C.E.S., 281 F. App 'x 66, 68 (2d. Cir. 2008).................42

## STATEMENT OF FACTS

Plaintiff pro se Reyna Arroyo commenced this action to correct an injustice of constitutional proportion after she was fired in May 2018 based upon her administrators at The College Academy lying under oath about her ability to teach. These administers presented their hostile, unsupported opinions to Arbitrator Lisa Pollack who, in turn, was under the control and influence of the Defendant, and pre-determined (before the first day of hearing) that Plaintiff must be terminated. The unsupported lies given in testimony were used to justify the alleged "facts" - based upon unsupported opinions - that Respondent Reyna Arroyo was permanently incompetent and would never be adequately capable to teach any students in any classroom. Her 19 years and 7 months of teaching was erased, or "reset", as the New York City Department of Education prefers to put the obliteration of Plaintiff's history of effectiveness as a pedagogue.

The Department had to erase Plaintiff's past teaching because in 2014 she joined the Gulino Litigation as a member of the certified class and in 2019 won a judgment on the disparate treatment she and other Latina teachers received at the NYC DOE. (The Department has filed an Appeal.) On December 5, 2012, the United States District Court for the Southern District of New York found that the New York City Department of Education ("DOE") failed to establish, as required by federal law, that the Liberal Arts and Sciences Test ("LAST") was related to the job of teaching. The LAST was an exam created and administered by the New York State Education Department ("SED") to teacher candidates. Test takers were required to achieve a passing score on the LAST in order to receive state certification to teach in New York State public schools.

The Court also found that because the LAST was not shown to be related to the job of teaching, the DOE had violated Title VII by requiring plaintiffs to pass the LAST in order to receive a teaching

license. The plaintiffs' complaint alleged, and the Court found, that the DOE was liable for making employment decisions based on the state's exam under a "disparate impact" theory of discrimination. On June 5, 2015, the Court found that the LAST exam administered after February 13, 2004 was also invalid and that the DOE violated Title VII by requiring claimants to pass the LAST to receive a teaching license.

In the same order in which the Court found that the DOE had violated Title VII by using the LAST administered prior to February 14, 2004, the Court also found that the plaintiffs could seek injunctive relief benefiting the entire class. In a subsequent order dated August 29, 2013, the Court further found that plaintiff class members are entitled to seek individualized monetary damages, such as backpay, and individualized injunctive relief, such as eligibility for in-system seniority. Finally, on June 18, 2014, the Court amended the class definition so that the relief rulings apply to African-American and Latino individuals employed as New York City public school teachers on or after June 29, 1995, who failed the Liberal Arts and Sciences Test ("LAST") given on or before February 13, 2004, and as a result either lost or were denied a permanent teaching appointment or were being terminated despite being tenured. Plaintiff Arroyo is in this class as a Latina who failed the LAST exam.

On December 28, 2015, the Court entered an injunction: (1) prohibiting the DOE from making any employment decisions based upon the LAST administered on or after February 13, 2004; and (2) providing individuals, who have satisfied certain enumerated requirements for an initial certificate other than passing the LAST-2, with the opportunity to become initially certified for the limited purpose of seeking employment with the DOE. See EXHIBIT H.

Another constitutional issue presented in Plaintiff's complaint deals with the denial of tenure rights and her property right to her job which were ignored in a clandestine, fraudulent process in New York City known as "3020-a arbitration". Neither Arbitrator Lisa Pollack nor Judge

6

Shlomo Hagler addressed the fact that the determination of probable cause in the tenure law Education Law 3020-a Section (2)(a) was never changed. Neither addressed the fact that Plaintiff never waived her right to have a vote on her charges by the PEP, and that the Chancellor never obtained the authority to vote on 3020-a charges and thus cannot delegate these charges. Additionally, before she was charged, Plaintiff was not given notice that the UFT, her Union, and Defendant secretly agreed to go around Education Law(2)(a) and circumvent current tenure law rights for teachers charged with misconduct or incompetency.

Indeed, the Delegation Memo (EXHIBIT D) submitted by Defendant at the 3020-a in opposition to Plaintiff's Motion To Dismiss (EXHIBIT C) does not mention the finding of probable cause, 3020-a arbitration, tenure rights, or any issue presented at the hearing. Thus, the Delegation Memo is worthless to the argument of due process violations and Education Law 3020-a(2)(a), which mandates a vote by the school board on probable cause. EXHIBITS A-F. This never happened, and therefore Arbitrator Pollack did not have subject matter jurisdiction, as stated in the decision handed down by Richmond County Supreme Court Judge Desmond Green in 2018 for the case of Rosalie Cardinale. See EXHIBIT G.

What the Delegation Memo does show is that the New York State Legislature considered and subsequently agreed to the transfer of the **initiation** of charges and other duties and responsibilities of the school board to the Chancellor **except for the determination of probable cause.** The determination of probable cause in Education Law §3020-a remained under the sole authority of the New York City School Board, the Panel For Educational Policy ("PEP"), in Executive Session after a vote by a majority of its members. (Education Law §3020-a Section (2)(a)).

7

Proof of the intentional support for the determination of probable cause to remain under the  sole authority of the PEP voting in an Executive Session can be seen in the following current rules and laws, all of which were ignored by the Department in this matter:

1.  The Chancellor was never given a vote on the PEP, and cannot delegate this vote to anyone. (current PEP Bylaws)

2.  Education Law §2590-b also states that: "The Chancellor shall serve as a non-voting ex-officio member of the Panel for Educational Policy."

3.  Nowhere in Education Law §3020-a is there a provision authorizing a Principal (or any single individual) to make a determination of probable cause. The State legislature never removed the independent participation of the school board, or PEP, in the finding of probable cause in disciplinary hearings held in New York City. (PEP Bylaws, EXHIBIT E)

4.  Initiating charges and finding and determining probable cause are two different actions and procedures. No principal or Superintendent can "initiate and resolve" 3020-a charges against a tenured teacher unless, and only, in cases where the Respondent waives his/her right to a hearing and/or settles the case before going to a full hearing. New York State's public policy stands firmly behind an arbitration /due process hearing for any tenured employee who is charged, and neither the Chancellor nor the Community Superintendent may terminate a tenured teacher who requests a due process hearing on charges filed against him/her.

5.  The proscription against voting by the Chancellor on PEP matters was intentional. The 2002 PEP Bylaws had permitted the Chancellor the right to vote; however, when PEP amended the Bylaws in 2009, they specifically removed that right. Notably, PEP unanimously adopted the amended Bylaws proscribing the Chancellor's right to vote.

6. Education Law §2590-f(t) states: "(t) **notwithstanding any provisions of law to the contrary**, to exercise all of the duties and responsibilities of the employing board as set forth in section three thousand twenty-a of this chapter pursuant to a delegation of the chancellor under section twenty-five hundred ninety-h of this article……"

7. Education Law §2590-h states: "The office of chancellor of the city district is hereby continued. Such chancellor shall serve at the pleasure of and be employed by the mayor of the city of New York by contract. The length of such contract shall not exceed by more than two years the term of office of the mayor authorizing such contract. The chancellor shall receive a salary to be fixed by the mayor within the budgetary allocation therefor. **He or she shall exercise all his or her powers and duties in a manner not inconsistent with the city-wide educational policies of the city board. …**"

8. Even if the NYC Chancellor could be given all the duties of the PEP, he/she would still have to hold an Executive Session and meet with at least one other person as part of an open public meeting. (New York State Open Meetings Law Section 105).

9. No Constitutional rights may be waived without written consent, and in this matter Petitioner affirmed that at no time did she waive her rights to proceed to an arbitration based upon a finding of probable cause pursuant to Education Law §3020-(2)(a). No waiver of the tenure law charging tenured employees of the Department by either the teacher's Union, United Federation of Teachers, ("UFT"), nor the Union for Administrators, Council of School Supervisors and Administrators, ("CSA") have posted a waiver of an educator's right to the charging process mandated in Education Law 3020-a(2)(a).

10. Additionally, there is no hidden waiver by the Department or Union, and none are allowed in these proceedings. Fraudulent concealment of a secret waiver of the rights of tenured

employees to the tenure law Education Law 3020-a(2)(a) by the NYC Department of

Education cannot be sanctioned and must prohibit any arbitral decision in this matter.

11. The two agreements between the UFT and the Department, one dated June 27, 2008 and the

other April 15, 2010, refer to what the agreed upon procedures are for 3020-a arbitration

AFTER the hearing has been placed under an arbitrator and is ready to start. The argument

for unlawful procedures presented here refers to procedures which take place during the pre-

hearing and charging period, before an arbitrator is appointed.

Judge Shlomo Hagler made a reversible error when dismissing the petition without basis in fact or

law and stating in his oral dismissal of the Petition nothing more than Petitioner was wrong on the

law and facts. See Plaintiff's EXHIBIT J, K; Defendant's EXHIBIT C.  Judge Hagler gave powers

to the Chancellor and the Principal, namely to determine probable cause, that no law, rule or

regulation gives them. The NYC Panel For Educational Policy cites, in the BYLAWS, that the

Chancellor is a "non- voting' member. (EXHIBIT E). Thus, no delegation of the vote is permitted.

There was no Executive Session. Judge Hagler not acknowledge this fact. The delegation memos are

without merit in the 3020-a procedures mandated in Education Law 3020-a.

In addition, Pollack stated on p. 3 of her decision that:

"Further there is no need for the IEPs. The Specification doesn't address any student behavior." In

Plaintiff's Article 75 Appeal she brought up the fact that there are no statistics or objective data in

observations yet Arbitrator Pollack terminated her based upon the opinion of the Principal that she

was no good as a teacher. But Plaintiff taught successfully for 19+ years and received excellent

reviews until she started asking about the services her IEP students were not getting.

See EXHIBIT I.

As for the grading fraud, Plaintiff cited examples of grading irregularities to the Special Commissioner of Investigation showing several students' final grades were changed but allowed to graduate anyway, even though they did not qualify to receive a high school diploma.

Most alarming is the fact that inside Plaintiff's 3020-a, "incompetence" was never proven. The Department tainted Plaintiff's case by promoting the idea that teaching has nothing to do with students, only the opinions of administrators. In a classroom situation, incompetence in its simplest terms means that a teacher is unable to provide a valid educational experience for students assigned to her classroom. The standard for a penalty of termination in these 3020-a hearings is the Just Cause standard based upon the facts presented at the hearing and available in the record.

Tenured individuals cannot be disciplined or removed from employment except for "just cause" pursuant to Education Law §3020. The procedures for such discipline or removal are set forth in Education Law §3020-a, Education Law §3020-b, and the Commissioner's Regulations 8 NYCRR Ch. II, Sub. C, Part 82-3.

The Just Cause Standard seminally defined by Arbitrator Carroll Daugherty, incorporates the following seven tests:

1. Did the employer give the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?

2. Was the employer's rule or regulation reasonably related to (a) the orderly, efficient, and safe operation of the Department of Education/school's educational guidelines and (b) the performance that the employer might properly expect of the employee?

3. Did the employer, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of the administration?

4. Was the company's investigation conducted fairly and objectively?

5. Did the investigator obtain substantial evidence or proof that the employee was guilty as charged?

6. Has the employer applied its rules, orders, and penalties evenhandedly and without discrimination to all employees?

7. Was the degree of discipline considered by the employer reasonably related to (a) the seriousness of the proven offense and (b) the record of the employee in his service with the company?

Five of the 7 steps involve an investigation into how and why the alleged conduct occurred, as well as the substantiating or not, of any of the allegations.

Just cause also includes principles of progressive discipline. Discipline is an adverse action taken by an employer against an employee because of the employee's behavior. 'Just cause' principles require that the discipline imposed upon an employee be just and fair.

Progressive discipline is a system of addressing employee behavior over time, through escalating penalties. The purpose of progressive discipline is to correct the employee's unacceptable behavior. Employers impose some penalty less than discharge to convey the seriousness of the behavior and to afford employees an opportunity to improve. The discharge penalty is reserved for very serious incidents of misconduct and for repeated misconduct.

The concept of progressive discipline is based on the premise that both employers and employees benefit when an employee can be rehabilitated and retained as a productive member of the work force. The trained employee is seen as a valuable resource, making it economically prudent to attempt rehabilitation of a current employee. The expected result of progressive discipline is that the employee will recognize he/she has engaged in unacceptable conduct and will correct his/her future behavior.

All progressive discipline systems use a series of steps, or disciplinary actions, which increase in severity. The generally accepted forms of discipline prior to discharge are oral warnings,

12

written warnings, and suspensions. Suspensions are typically the next step following oral or written warnings in progressive discipline and may be imposed following one or more incidents of less serious misconduct for which the employer has issued warnings. They result in the employee being removed from the work place for a designated period of time, in loss of pay, and sometimes in loss of seniority for the period of the suspension. The suspension places a blemish on the employee's employment record and, like warnings, can serve as a basis for more severe discipline in the future.

Some arbitrators emphasize that suspensions should be corrective or rehabilitative, not punitive and serve to restore him/her to acceptable levels of production and/or behavior. A suspension may be overturned or reduced if found to be unduly harsh or retaliatory, rather than corrective.

Discharge is the most extreme industrial penalty since the employee's job, seniority, and other contractual benefits and reputation are at stake. It was once referred to as "industrial capital punishment."

While arbitrators often speak of discharge as part of a disciplinary progression-a penalty which is a step above lesser penalties-the perception is flawed. Discharge and suspension are separate and distinct penalties. Suspensions are corrective measures designed to rehabilitate. Discharge on the other hand is the severance of an employment relationship.

An employer has no legitimate interest in whether or not a discharged employee ever achieves rehabilitation. Its sole purpose is to unburden the work force of an individual whose conduct has become intolerable. In other words, discharge is designed to abolish the employment relationship; disciplinary suspension is designed to improve it.

Where discharge is the final step in the progressive discipline process, the employee will usually have received several warnings and often at least one suspension.

The Courts have also given an official definition of "incompetence" in the case of Arno Arrak,

13

28 Educ. Dept Rep. 302 (1988). *Arrak* sets a very high burden for a determination of termination for incompetence. In Arrak,the  three member panel dismissed the charges of incompetence against Arrak saying that although Arrak was not a "good" teacher, his performance "did not fall below the minimal level expected of a reasonable teacher" as determined by the following criteria:

\*requisite knowledge of subject matter content;

\*ability to communicate content facts;

\*ability to motivate and interest students;

\*ability to maintain a classroom environment reasonably conducive to learning;

\*ability to assess and evaluate studentperformance.

These criteria for determining teacher competency have consistently been followed since the issuance of the *Arrak* decision, by both the Commissioner of Education and hearing officers designated to hear incompetency charges against tenured teachers.

As noted by New York's Court of Appeals in Ricca v. Board of Ed. of the City Sch. Dist, 47 N.Y.2d 385, 418 N.Y.S.2d 345 (1979):

"The tenure system is not an arbitrary mechanism designed to allow a school board to readily evade its mandate by the creation of technical obstacles . ... Rather it is a legislative expression of a firm public policy determination that the interests of the public in the education of our youth can best be served by a system designed to foster academic freedom in our schools and to protect competent teachers from the abuses they might be subjected to if they could be dismissed at the whim of their supervisors. In order to effectuate these convergent purposes, it is necessary to construe the tenure system broadly in favor of the teacher, and to strictly police procedures which might result in the corruption of that system by manipulation of the requirements for tenure."

Plaintiff Reyna Arroyo's pedagogy was in fact excellent, and can be judged as much better than the standard set by the Arrak panel. She is a competent chemistry teacher for 19+ years and a valuable asset to the Department and the students in New York City.

Plaintiff earned her undergraduate degree in Chemistry in the Dominican Republic from Universidad Autónoma de Santo Domingo in 1990. She then began to work in the NYC Department of Education in 1998 . Her record is excellent, until 2014 and the use of Danielson to rate teachers. The Danielson rubric is being misused, and Charlotte Danielson herself agrees with this.

The Principal, Sigerson, actually did not meet with her after the observations, and attended her classroom observation only for 7 minutes, not even the 15 minutes required in Danielson, another violation of the procedures mandated by the UFT and DOE. No observer who could teach high school chemistry ever observed Plaintiff. This makes no sense. The reason, we argue, is that a chemistry teacher who observed Plaintiff would judge her pedagogy as excellent. The Department did not want this.

The obligation of the employer to adequately train or give motive of misconduct is set forth in Education Law 3020-a (4) as follows:

"[T]he hearing officer shall consider the extent to which the employing board made efforts towards correcting the behavior of the employee which resulted in charges being brought under this section through means including but not limited to remediation, peer intervention or an employee assistance plan" (emphasis supplied.)

Department witness Wendy Poveda was openly hostile during her testimony, and very much interested in seeing Plaintiff terminated. She told the arbitrator, "I'm a bilingual certified teacher and I taught three, four--grades three, four and five." (T1317). She never taught high school or chemistry. She clearly misinformed the record on the evaluation process when she testified, and here are a few examples:

On p.1323 of the transcript, she testified that her low-inference notes, the very same notes which were used to rate Plaintiff but were not given to Plaintiff until the day of the hearing (January 5, 2018) were not subjective. What she wrote about what she saw was not her personal opinion.

How could they not be her subjective opinion? As the low-inference notes are so important in the evaluation process, why not give these notes in a timely fashion, so that the Plaintiff may use the information to improve their pedagogy?

Why indeed.

On p. 1333-1338,

Poveda testified that she entered the classroom six minutes after it had started, at about 9:52 am, and stayed until 10:26AM. She had been an AP at the College Academy for 6 days. She knew nothing about chemistry, but was told to observe Plaintiff, a teacher she knew nothing about. She did not look at any of the student records. She did not see a mini lesson, so she concluded there was none, even though Plaintiff had a lesson plan with mini lesson on it.(T1336) Poveda saw students calling out answers but were never acknowledged. She saw no differentiation. But, she insisted, students calling out answers to questions and Plaintiff ignoring these students was entirely inappropriate. (T1415)

She did not know that Plaintiff had set rules, whereby she would ignore a student who called out rather than raised his/her hand. Plaintiff's rules made her classroom management a model for all teachers. Poveda made sure that she testified to Plaintiff's complete lack ability to teach, manage students, etc., everything was wrong.

When asked what Plaintiff did at the end of the class, whether she did everything that she was supposed to and that Poveda did not see, Poveda answered,

"'til the end of the class?

16 A. --the end of the period? No"(T1419)

5 A. "I was not there to observe it, so how would

6 I know?

7 Q. Oh, so you don't know. Correct.

8 A. [Interposing] Mm-hmm.

9 Q. did you ask her in

10 the post-observation--

11 A. [Interposing] MM-hmm.

12 Q. --what she did during those ten minutes?

13 A. It is not relevant in the post-observation."

(T1420)

On p. 1420, Poveda was asked by Plaintiff's attorney if she asked Plaintiff in the post-observation whether there was a mini lesson before arrival into the classroom, and whether Plaintiff had any technique or motivation in not recognizing those students who were calling out an answer, and Poveda's answer was, "No" (T1421)

On p. 1446 Poveda testified that

"A. I cannot speak for where I was not at. The

3 point of an observation is to record what you hear

4 and see while you are present. That is what goes

5 into that—

Do you know if the teacher gave the

17 students the answers after you left the class?

18 A. I do not know."

17

"Q. Okay. Would it have been appropriate for

5 you to have asked her that question?

6 A. No.

7 Q. Would it have been appropriate if you had

8 asked her if she did a mini--a mini class before you

9 arrived?

10 A. No." (p. 1447)

On p. 1449 Poveda testified that in the Danielson Framework

"you are

14 only allowed--terms of my training at the District

15 level, you are only allowed to rate a teacher on what

16 you hear and what you see and the preponderance of

17 evidence collected."

"I cannot rate you on something that took place prior

9 to when I was in the room. I cannot rate you for

10 something after the time. So even if I was there for

11 15 minutes and I chose to stay for the re--for the

12 rest of the period, that is, that is when the rating

13 has to stop."

On p. 1450:

"Q. Let's ask a hypothetical. Let's assume

15 that in the post-ob. you say, "You know, the kids

16 said you weren't helping them." And Ms. Arroyo

17 volunteered and said, "You know, after you left, I

18 sat down with these kids, and I gave them everything

19 of blah, blah, blah." Would that have changed your

20 evaluation?

21 A. It can't, because I--it wasn't what I saw." She added to this on p. 1461, saying that as the

evaluator, she cannot speak to whatever happened before or after she came and left the classroom,

because she was "not there physically to witness anything."

This testimony is stunning because of its extreme departure from the rules of evaluating a teacher.

And, this who procedure as stated by Poveda is not described in Danielson. Any observer should ask

a teacher what he/she did before and after an observation, especially if the amount of time spent in

the classroom is only 15 minutes.

And Poveda was terribly wrong when she testified that she cannot ask what happened when she was

not actually in the classroom. Danielson, as bad as it is, says nothing about an observer/evaluator

being prohibited from asking what happened when he/she was not in the classroom.

Poveda testified that she does not have to share her low-inference notes with the teacher she wrote

about.(T1453)

This makes no sense, but most certainly denies the teacher a fair observation report.

When Poveda was asked by the arbitrator (T1465) whether Plaintiff could have done a mini lesson

before Poveda entered the classroom, Poveda answered,

"23 A. Anything's possible I suppose.

19

A. Right. A teacher can shorten their mini

3 lesson I suppose. –" (T1467)

It is clear that the administrators did not want to give Plaintiff a chance to succeed, and therefore important procedures designed to protect Plaintiff's employment were missing here, in order to get her removed from the school payroll. The administrators at The College Academy never gave Plaintiff any help in improving her pedagogy. The many violations of mandated procedures and rules denies Plaintiff a fair evaluation and rating, and there should be no penalty given to her.

The violation of New York State Laws in pursuing charges against Plaintiff was brought into these proceedings by Plaintiff before the prehearing began. All parties agree that there was no vote, and no determination of probable cause in an Executive Session of the Panel For Educational Policy, the New York City School Board, as Plaintiff's charging papers required in Section 2a of Ed. Law 3020-a. The Department argued that the Chancellor was given the right to initiate charges, and delegate this authority to Superintendents in Ed. Law 2590.

But initiating charges is not the same as finding probable cause. Additionally, as the PEP Bylaws do not give the Chancellor a vote on the PEP, the Chancellor cannot delegate this vote, nor can she give herself the authority to have a vote so that she can determine probable cause for the specifications charged here.

Most importantly for this argument to prove the invalidity of the Department's opposition to Plaintiff's Motion To Dismiss is the following:

"No local legislative body is empowered to enact laws or regulations which supersede state statutes, particularly with regard to the maintenance, support, or administration of the educational system. N.Y. Mun. Home Rule Law § 11(1)(c)"

Not a single case mentioned in the Department's Opposition to the Motion cited Municipal Home Rule Law 11(1)(C) and therefore, these proceedings started out on the wrong foot. The issue of whether or not there was subject matter jurisdiction for the arbitrator in this case to proceed with these hearings, remains unanswered.

The Courts have noticed. In the matter of *Lovinger v New York City Board of Education 46627/03* , Brooklyn Supreme Court Judge Yvonne Lewis wrote:

""this court has been placed at a difficult crossroads which it is loathe to journey. Assuming that the petitioner's assertions are true, one fork would have this court reach the conclusion that the OSI investigators, in complicity with school officials (principal, vice-principal, etc.), fabricated an investigation in order to wrongfully terminate Mr. Lovinger. " and, "Certainly, the just mentioned factors raise grave concerns of due process violations that cannot be disregarded without further clarification."

And New York State Supreme Court judge Alice Schlesinger wrote in the case of teacher Teddy Smith,

" The simple and ineradicable fact is that voluntary arbitration and compulsory arbitration are fundamentally different if only because one may, under our system, consent to almost any restriction upon or deprivation of right, but similar restrictions or deprivations, if compelled by government, must accord with procedural and substantive due process."

Why does the Department support the denial of a fundamental Section of Education Law 3020-a?

Because in these New York City cases the Department brings hearsay, restrictions on witnesses, limits on testimony, and misinformation about facts and procedures to the table, and expects the arbitrator to go along with the misrepresentation of fact and truth. The Department wants complete control over what is "relevant" or not. Thus they made up the rule that no witness could testify for the Plaintiff if they were not in her school during the charged period. This is not a rule, regulation or law, but simply the Department's pursuit of total control over the Plaintiff's defense.

In the Matter of the Island Trees Union Free School District v Butcher, 61 A.D.2d 1011 (1978), the Second Department Appellate Division states that:

"Any degree of confidentiality accorded to the students' records must yield to the appellant's right to

prepare his defense to the charges made against his reputation and his competence in his profession."

While this case refers to student records, the intention is clear, to permit a charged employee submit all evidence which he/she believes should be considered for a proper defense.

A timely, thorough investigation of suspected misconduct is important to reach the Just Cause standard for two self-evident reasons:

(a) **Fair Play**. Due process requires that an employee be informed promptly, and in reasonable detail, of the charges (or possible charges) against her and given the chance to tell her side of the story. If the company fails to let the employee defend himself, *or bypasses other avenues of investigation,* whatever penalty has been imposed is likely to be reduced by an arbitrator, even if the employee is clearly guilty.[emphasis added]

(b) **Sufficient Proof.** A faulty and inadequate investigation often produces faulty and inadequate proof. A thorough investigation may elevate assumptions and suspicions to the status of proof; avoid reliance on hearsay and other "lightweight" or "nonweight" evidence; prevent later-discovered evidence from being thrown out on the ground that it was irrelevant to the actual decision; or provide the "extra ingredient" that tips the scales in the company's favor. (See *Just Cause: The Seven Tests*, The Bureau of National Affairs, Inc.,1992, p. 187)

The basic elements of just cause include a determination as to whether the employee was afforded fundamental due process rights implicit in the just cause clause – e.g., did he/she have forewarning or foreknowledge that his/her conduct would lead to discipline, was a fair investigation conducted, and was the employee treated fairly – e.g., were the employer's rules consistently enforced and fairly judged? Here, they were not. But the Just Cause principal takes effect AFTER the arbitrator

takes the evidence and reviews it for penalties. Here, the Arbitrator did not have Just Cause because she did  not have subject matter jurisdiction.

The burden of proof is with the Department to prove that Plaintiff never provided a valid educational experience to her students. But this conclusion can only be reached by a leap of faith, because the Department never defined what a valid educational experience is, never showed student work as evidence of any kind of learning experience nor did they define the data or statistics which would prove this experience.

The Department built their case on hearsay and subjective opinions of administrators who showed their disdain for Plaintiff during their testimony. In The Matter of Great Neck Union Free School District v M.H. (SED #5043, Joel  M. Douglas, Hearing Officer; Decision and Award July 20, 2008), M.H. was charged with 41 Specifications of "incompetency" including

- ineffective classroom management
- the lesson was teacher dominated
- did not follow recommendations
- ineffective delivery of instruction

Hearing Officer Douglas stated that:

"The record demonstrates that for a teacher to be charged with incompetence, and for the Specifications to be sustained, the teacher must fall below the minimum level of the competency expected of a reasonable teacher…That the Plaintiff did not live up to [her Supervisor's] expectations does not *de facto* establish a degree of incompetency…."

The requirement of proof has three earmarks – all sides to the dispute have been considered, all relevant evidence has been obtained, and the investigation has been timely. (*Just Cause*, pp. 189-190).

Under Education Law §3020-a(3)(c), the Department must present more than hearsay for the disciplinary charge or action. N.Y.C. Arbitrator Josh Javits ruled in a decision (Woda, SED file #10, 831):

23

"It would be unacceptable to accept the hearsay evidence of an individual as conclusive proof of an allegation over the live testimony of a teacher with fourteen (14) years of teaching. The Plaintiff has the right to confront and challenge the testimony of her accuser, and to have the accuser's credibility tested. Absent this right, the Hearing Officer cannot accept that hearsay evidence alone satisfies the Department's burden of proof with respect to this issue." (p. 69)

And,

"It is well established that a disciplinary charge pursuant to Education Law 3020-a cannot be sustained when the only evidence to support a charge is uncorroborated hearsay."     DOE v. Rykman, SED File No. 17,731(Bluth, 2012), at 49.

The Department did not present a preponderance of the evidence in support of the hypothesis that Plaintiff was permanently  incompetent either in the past, present, or future. The Department's witnesses testified only to their opinion of what they saw in 15 minutes. Principal Sigerson did not even stay of the minimum of 15 minutes, and he did not tell the truth about meeting with Plaintiff after the observations he said he observed. There were no supporting data or factual, objective evidence to support the testimony of any of the Department witnesses, they had the focus of termination always before them, and remained true to the script, for the most part.

The Department did not follow the correct procedures to validate their opinions. They did not sign or date several observation reports, did not show any low inference notes on these observations to Plaintiff, and did not follow up on recommendations on how Plaintiff could improve.

Observations have no facts, data, or statistics. The New York State Supreme Court, Kings County, and the Second Department Appellate Division in the case of Elentuck v Green, 202 A.D.2d 425; 608 N.Y.S.2d 701; 1994 N.Y. App. Div. LEXIS 1956:

"The Chancellor's Committee reports consisted of findings and recommendations regarding personnel actions to be taken by the board of education. The reports were prepared to assist the chancellor and were not binding. The hearing panel reports relating to N.Y. Educ. Law § 3020-a

consisted of findings and recommendations subject to challenge by an appeal to the State Commissioner of Education, were not binding on either the board of education or the commissioner of education, and did not constitute final agency determinations. Thus, the requested Chancellor's Committee reports and hearing panel reports were pre-decisional material exempt from disclosure under N.Y. Pub. Off. Law § 87(2)(g).The lesson observation reports consisted solely of advice, criticisms, evaluations, and recommendations prepared by the school assistant principal regarding lesson preparation and classroom performance."

Plaintiff received no meaningful, 1:1 assistance from anyone at the school. There was no professional development specifically designed to assist Plaintiff. The success or failure of the Plaintiff's students is, the Department argues, irrelevant. All of these arguments are incredible and show bad faith by the Department.

This policy of considering student grades, records, outcomes and data as irrelevant to the issue of whether Plaintiff should be fired is simply, and clearly irrational. With the added absurdity of basing the opinions of administrators on nothing but 15-minute observations the Department's argument to terminate must fail.

In this matter the Department offered a buffet of opinions from several administrators to convince you that the Plaintiff is terminally incompetent, that is, unable to ever become a good teacher. The DOE insists that the opinions of their witnesses as seen in the observations, are facts, and provide a preponderance of evidence that the Plaintiff simply will never be a good teacher no matter what the administrators do to help her.

Where the argument for guilt is based solely on circumstantial evidence, the nature of that evidence must exclude all other reasonable explanations. A stringent standard exists for measuring the

sufficiency of circumstantial evidence to minimize the "danger legitimately associated with circumstantial evidence – that the trier of fact may leap logical steps in the proof offered and draw unwarranted conclusions based upon probabilities of low degree" *People v Guiliano, 65 N.Y.2d 766, 768, 492 N.Y.2d 939 (1985).*

In Abramowitz v. Board of Education, 46 NYS2d 450, the Court of Appeals stated,

"...the public policy expressed in the tenure statutes is designed to protect individual teachers, as public servants, from being dismissed without a hearing once their competency has been demonstrated. It is a form of job security which insures stability in the educational system. While there is certainly a *public* interest in retaining quality teachers, the primary benefits of the tenure statutes are enjoyed by the individual tenured teacher."

and,

"Clearly, this statute does form a critical part of this system of contemporary protections that safeguard tenured teachers from official or bureaucratic caprice. To that end, Section 3020-a and the Regulations promulgated thereunder by the Commissioner of Education attempt to harmonize the method of removing tenured teachers with the dictates of procedural due process. We do not gainsay the importance of these standards, both in terms of their role in protecting the rights of individual teachers whose years of satisfactory service have earned them this security and in fostering an independent and professional core of teachers. It follows that this shield of Section 3020-a is not lightly to be put aside."

One reason for the failure of the Department's case to prove Plaintiff's incompetency is the Department's policy and practice of using as proof of their claims the non-final subjective opinions of administrators who observe and then judge Plaintiff after supposedly looking at her teaching for

15-minutes. During those 15 minutes the Department reviews the entire panoply of Danielson's rubrics, looking for 100% excellent teaching in each category, in every class, every day. This makes no sense. A lesson is a series of events which are planned out in a lesson plan created by the teacher for a 45-minute or 90-minute class. If the administration decides to come in at the beginning of a lesson for 15 minutes and say that the teacher is ineffective because the assessment of what the students learned did not occur – which usually occurs at the end of the lesson - there is something wrong with the observer of the lesson, not the teacher. This type of rating process is malicious and undermines the integrity of evaluations because the conclusions are not based on fact, but solely personal opinions.

Starting in the 2013-2014 school year, the Danielson Rubric became the vehicle for finding incompetency, something Charlotte Danielson herself opposed:

"Ms. Danielson places the lion's share of the blame with state legislators who oversimplified her techniques via their adoptions, and — especially — with administrators who are not capable of using the Framework as it was intended. She writes, "[F]ew jurisdictions require their evaluators to actually demonstrate skill in making accurate judgments. But since evaluators must assign a score, teaching is distilled to numbers, ratings, and rankings, conveying a reductive nature to educators' worth and undermining their overall confidence in the system.""

**DANIELSON FRAMEWORK CRITICIZED BY CHARLOTTE DANIELSON**

**https://tedmorrissey.wordpress.com/2016/04/27/danielson-framework-criticized-by-charlotte-danielson/**

The 22 components of Danielson which were required by the Department in 2013-2014 were pared down to 8 in the 2014-2015 school year, which is a charged year in this case and thus a discussion of Danielson as a rating tool is relevant to Plaintiff's argument that she is, indeed, an excellent teacher.

Nobody has demonstrated any positive correlation between teacher assessments based on the Danielson rubrics, good teaching, and the implementation of new higher academic standards for students under Common Core. A case demonstrating the relationship could have been made, if it actually exists. There are many unfounded claims made by principals who use the Danielson Rubric not to evaluate, but to terminate. Indeed, the new evaluation system made it easier to fire markedly poor performers and is mostly a weapon to harass teachers and force them to follow dubious scripted lessons.

Charlotte Danielson herself says that she did not write the Danielson Rubric for rating teachers by a number or label, and that it's not appropriate for evaluating teachers. It's appropriate to use it for teachers to improve their instruction.

Given the original purpose of the Framework — to evaluate first-year teachers — it made perfect sense to cast the top level of "distinguished" as all but unattainable, but it makes no sense to place that level beyond reach for high-performing, experienced educators. This approach is demeaning and demoralizing — it erodes morale as well as respect for the legitimacy of both the evaluator and the evaluation process.

The problem is that it implies "classroom teacher" is a monolithic position, and nothing could be further from the truth. Thus, having one instrument that is to be used across grade levels, ability levels, not to mention for vocational, academic and fine arts courses is, simply, wrongheaded.

Common Core places a premium on deep conceptual understanding, thinking and reasoning, and the skill of argumentation (students taking a position and supporting it with logic and evidence). This cannot be observed by someone popping into your classroom every so often, perhaps skimming through some bits of documentary evidence. The Danielson reliance on active learning seems to be the equivalent of students simply being active in an observable way (via small-group work, for

example, or leading a class discussion), but learning happens in the brain and signs of it are rarely visible. Evaluators prefer extroverted learners because they can see them doing things, whereas introverted learners may very well be engaged in far deeper thinking, far deeper comprehension and analysis — which is, in fact, facilitated by their physical inactivity.

Thus we see statements that the students were not "engaged" and the teacher is labeled "developing" or "ineffective". This is not rational.

It is a fact that 3020-a hearings must be strictly construed in favor of the Plaintiff teacher as the Education Law protects the constitutionally recognized interests of government employees to continued employment. Adrian v Board of Education, 60 A.D. 2nd 840. And the Hearing Officer should be mindful of the stated purpose of 3020-a as articulated in Bott v Bd. of Educ., specifically as a "determination of the fitness of the teachers against whom they may be brought to continue to carry on their professional responsibilities."

Education Law Section 3020-a hearing procedure was legislatively formulated as the procedural vehicle both to protect public policy underpinnings of the tenured statutes as well as to fulfill the requirements of constitutional due process. Tenured teachers at public institutions are entitled to due process protection when their liberty interests are arguably infringed. Liberty interests arise when institutions make charges or allegations against employees that may damage their reputations or impose a "stigma or other disability" preventing them from obtaining other employment.

Fair treatment requires that alleged deficiencies in classroom performance be substantiated with specific facts, not merely sketchy generalizations and conclusions. Panels of arbitrators have found evidence of incompetence vague, incomplete, and often contradictory and have refused to "elevate…brief cursory commentaries to a prima facie case of classroom incompetency." (Center Moriches Union Free School District v William McCartin, N.Y.S. Ed. Dept. at 17 (1982).

Plaintiff demonstrated that she was more than "capable" of providing competent satisfactory instruction. The Plaintiff utilized effective, rigorous teaching techniques in her lessons. She developed thought-provoking, deep lessons that linked complex ideas and themes. Plaintiff displayed an intense passion for the subject matter of her lessons, as was evidenced during her testimony, and a genuine satisfaction in imparting her knowledge and teaching her students.

However Plaintiff was a weak link at her school, due to English not being her first language, but rather than this being an unsurmountable hurdle, Plaintiff became a stellar teacher and asset to the New York City Department of Education as a bi-lingual chemistry teacher for 19 years and 7 months. On May 28, 2018 Plaintiff was suddenly and inexplicably terminated after a malicious prosecution known as "3020-a arbitration" wherein she was inexplicably declared "incompetent" and permanently so, meaning she could never become an effective teacher no matter how much professional development and support she received. The arbitrator who made the decision, Lisa Pollack, ignored Plaintiff and her witnesses and went along with whatever the Department's witnesses testified to. The Department suddenly and maliciously wanted her removed from payroll because she was too expensive, and her English language skills were in need of improvement, but they did not want to spend a dime or the time on giving her a chance.

Plaintiff had never had any prior disciplinary action taken against her, and Arbitrator Pollack chose to overlook this fact and deny Plaintiff her right to progressive discipline and remedial assistance.

Compulsory Arbitration known as 3020-a is not supposed to be punitive. But Arbitrator Pollack punished Plaintiff for not staying silent about the lack of services for her students, and Judge Hagler went along with it. Judge Hagler is well known as a judge who has never granted a pro se teacher's Petition. (See EXHIBITs J, K.)

Plaintiff requests that all the information included in her Complaint be incorporated by reference herein.

ARGUMENT

In sum, Plaintiff has a cause of action, namely that she was terminated for no reason other than that there was, before the 3020-a arbitration, an unlawful procedure which denied her the tenure rights to a vote on probable cause before the hearing began, and but for the fact that her first language is Spanish and she is a Latina woman who has been treated differently than white teachers as noted in the Gulino Litigation. She was also wrongfully terminated because she asked questions about grade-changing by the administrators at her school, a protected right she has under the First Amendment. Plaintiff spoke out as a private citizen on matters of legitimate public concern. Plaintiff's Constitutional tenure rights to her job were ignored by Arbitrator Pollack and Judge Hagler, and she requests that the Motion To Dismiss submitted here by the Defendant be denied in full.

The Defendant argues in their Motion, the 3020-a hearings need to go quickly, so in NYC the Administrative Trials Unit (ATU) and the Teacher Performance Unit (TPU) panels were set up around 2007 to speed up the 3020-a arbitration hearings. See Defendant's letter Motion sent to the Court dated October 18, 2019, p. 3. This fact was substantiated in a video which can be seen on the blog NYC Rubber Room Reporter:

**"The 3020-a Arbitration Newswire: Digging Up The Garbage On the UFT/DOE Partnership of Harm For Charged DOE Employees**
https://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html

The article was created May 28, 2016 by Betsy Combier, Editor of the blog and also part of Plaintiff's team helping her at her 3020-a hearing. A transcript of Carmen Farina's speech and the discussion which followed is also available in this blog post. In the transcript and on the video former Chancellor Carmen Farina states openly that the arbitrators and attorneys for NYSUT and the

Department of Education are "her army", that speed should be the most important criteria, not rights, and that she is the person who is the chief administrator/boss of these teacher discipline hearings. Plaintiff fails to agree with the Department that this is rational, and/or preserves her rights. In 2007, the almost 2000 educators reassigned to "rubber rooms" all over New York City were screaming for help to the newspapers. These educators were virtually imprisoned while getting their full salaries to do nothing but sit and wait (sometimes for 7-15 years) for their 3020-a hearing. Mayor Michael Bloomberg realized that he had made a mistake in allowing principals to throw out anyone they chose, for any reason, so he decided that he would close the rubber rooms, and then he had to erase the backlog in the reassignment centers. He decided to speed the hearings up, and one way was to set up panels of arbitrators who would remain under his control by having the hearings at the Department by arbitrators he and the UFT picked.

In 2012, a Motion To Dismiss For Lack of Subject Matter Jurisdiction was submitted in all the 3020-a arbitrations done by a legal team which included Betsy Combier, a nonlawyer researcher/advocate for teachers' rights. This Motion exposed the one law that was never changed that Mayor Bloomberg considered a challenge to his control over tenure rights: Education Law 3020-a(2)(a). He made some attempts to change the law and the Bylaws of the PEP, but this particular mandated procedure of voting on probable cause by the school Board and NOT the Chancellor (who was never given a right to vote on any issue) was, and never has been, changed. Instead, the Department and the UFT secretly passed the law by, hoping no educators charged with 3020-a would notice.

When teachers started to present this Motion to their arbitrators, then the Department made it clear that they were not to agree with the Motion or it's main point, which was that without a vote on probable cause, they had no subject matter jurisdiction to make a decision on any penalty, if there was a finding of guilt for any of the charges. In this case the PEP never held an Executive Session

and never voted on Plaintiff's charges. Arbitrator Pollack and Judge Hagler all denied Plaintiff

Arroyo the right to an Executive Session of the PEP and a vote on the charges, and they all

agreed to base the charging upon another Law, Education Law §2590-h which gives the

Chancellor the right to delegate to any Superintendent or principal the right to *initiate* charges.

Nothing is in writing about finding probable cause. Preferring/initiating charges is not the same

as determining probable cause. In any case, the issue before Green and presented here is that

Plaintiff was not given her rights to due process to have an arbitrator fairly hear and decide her

case BEFORE she was officially charged. The Defendant's entire opposition to Plaintiff's

Complaint is founded on the premise that she is complaining about not being fairly judged

AFTER the 3020-a arbitration started. The parties are mixing apples with oranges.

Plaintiff argues that Defendant's statement on p. 3 of their letter to this Court, copied below,

obviously attempts to excuse the denial of subject matter jurisdiction and tenure rights in favor

of speedy hearings by saying that the "efficiency" of the arbitrator selection by the Department

serves a rational, legitimate governmental purpose:

> "Thus, Plaintiff cannot demonstrate that DOE lacks a rational basis in using
> a rotational panel of arbitrators for arbitrations involving UFT members
> and a different arbitrator- selection mechanism for employees, such as
> principals, who are not covered by the DOE-UFT contract. This Court, in
> *Adams v. NY. State Educ. Dep't*, dismissed an equal protection challenge
> [2] to this same arbitrator selection policy, noting that the policy was
> enacted in an effort to improve efficiency, which constituted a legitimate
> governmental purpose. *Adams v. N.Y. Stale Educ. Dep't*, 752 F.Supp.2d 420,
> 459-60 (S.D.N.Y. 2010). Therefore, Plaintiff has failed to state a claim
> under the Equal Protection Clause of the Fourteenth Amendment."

This is the same as a parent saying that his or her son cannot have any shoes, because then they

could run, and the parent doesn't want that, and knows best.

On March 29, 2018, Richmond County Judge Desmond Green ruled in the case of Rosalie

Cardinale v New York City Department of Education (Index No. 85165/2017) that the lack of

proper procedures in filing the charges pursuant to Education Law §3020-a(2)(a) did, indeed,

deny Ms. Cardinale her Constitutional rights to due process, and he vacated her termination.

Defendants do not mention the Cardinale decision in their Motion To Dismiss, and therefore

cannot oppose Plaintiff's claim to a lack of due process at his 3020-a hearing and a lack of

subject matter jurisdiction for Arbitrator Murphy.

### POINT I: PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE DOCTRINES OF COLLATERAL ESTOPPEL OR RES JUDICATA

Defendant argues that Plaintiff's claims presented to this Court are barred by Collateral Estoppel and

that Plaintiff's claims must be dismissed. This argument fails due to the fact that none of Plaintiff's

claims to First Amendment speech, due process pursuant to the Cardinale decision, or protection

under the Fourteenth Amendment have been litigated or even discussed by Pollack, Hagler or

Defendant in any prior forum in the termination of Plaintiff.

Collateral Estoppel means that any issues that have been litigated cannot be litigated again.

The doctrine of collateral estoppel often comes into play when a subsequent case, similar to a case

already adjudicated, is filed. The rationale behind the doctrine is that an issue or cause of action fully

litigated should not be litigated again. Res judicata is often referred to as "claim

preclusion". Collateral estoppel is often referred to as "issue preclusion".

Res judicata is raised when a party thinks that a particular claim was already, or could have been,

litigated and therefore, should not be litigated again. When addressing a res judicata argument, a

court will usually look at three factors. First, the court will consider whether there was previous

litigation in which identical claims were raised, or in which identical claims could have been raised.

The second factor to be considered is that the parties must be the same parties as those who litigated

34

the original action. The third factor is that the original action must have received final judgment on the merits.

Final judgment does not occur when the case is settled by the parties on their own, or where the judge decides a motion or makes some other determination that does not resolve the case based on the facts and evidence of the case. This means that the final judgment must concern the actual facts giving rise to the claim. Dismissal of a case because the court does not have subject matter jurisdiction, because the service of process was improper, because the venue was improper or because a necessary party has not been joined, for example, are not judgments on the merits. Grants of these types of motions to dismiss really have nothing to do with the facts, except that the litigation is precluded by a technicality. As such, subsequent litigation as to whether the defendant is liable would not be barred.

Collateral estoppel arises when the claim (cause of action) at the bar has not been litigated, but the exact issue that is now before the court has been raised and litigated in an earlier action or proceeding. Collateral estoppel is a bit different than res judicata, although the rationale is the same – it is a tool to prevent re-litigation of issues already litigated. See U.S. v. Wells, 347 F.3d 280, 285 (8th Cir. 2003):

"The collateral estoppel doctrine provides that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'

The requirements that must be satisfied before the doctrine of collateral estoppel is applied are similar to those for res judicata, but there are differences. First, the issues in the first and second litigation must be identical and must have been before a court. Second, the issue must have

been actually litigated. Third, a final judgment must have been rendered, ultimately deciding the issue in question.

The first factor is that the issues in the previous and subsequent litigation must be identical. Using the transaction or occurrence test would be too broad for collateral estoppel in most cases. Rather, the court will require that the issues be identical or very similar. When considering the doctrine of collateral estoppel, it is important to note that the subject matter of the subsequent litigation does not need to be the same as the subject matter of the previous litigation for the doctrine to apply. As long as the issue was already litigated, collateral estoppel can apply.

The second factor is whether the issue was actually litigated during the first case. Unlike with res judicata, if the issue could have been raised, but wasn't, the defendant will not be collaterally estopped from raising the issue in subsequent litigation.

The third factor is that the issue must have necessarily been decided on the merits. There are two requirements for this factor. First, the issue must be implicated in the judgment. If an issue is raised in the previous litigation, but the issue is not decided or has no connection to the judgment, then the issue cannot be the target of collateral estoppel. Along these lines is a jury's finding that is not one of the reasons for the judgment. For example, if the plaintiff brought a negligence action with a two count complaint, with both counts sounding in negligence, but the jury simply finds that the defendant was negligent, the doctrine of collateral estoppel probably cannot be invoked, since it is not clear which issue was the subject of the final adjudication. Second, like res judicata, the issue must have been decided on the merits and not based on a technicality.

It must be noted that 3020-a Arbitration is not a Court, there is no Judge or jury, and rules of evidence, hearsay and other laws are relaxed to the point of being almost nonexistent. Arbitrator

Pollack was chosen for Plaintiff's case by the Department of Education, thus there was no wheel to turn for the appointment. Plaintiff had no say in choosing the arbitrator and was not given her due process because Pollack did not have subject matter jurisdiction to decide any issue brought to her attention in the Specifications, and certainly not the Constitutional issues raised here.

Plaintiff argues that Arbitrator Pollack never had subject matter jurisdiction to terminate her at the compulsory 3020-a arbitration hearing because of procedural violations of law which impaired her tenure rights to due process as cited in Education Law 3020-a. Plaintiff did not, at any time, waive her rights to a hearing on §3020-a charges that must be presented to the Panel For Educational Policy (PEP) for a vote in Executive Session in compliance with Education Law 3020-a (2)(a).

In the papers with the title "Notice of Determination of Probable Cause on Education Law §3020-a Charges" (Plaintiff's EX B), the date of the Executive Session is missing and there is no information on a vote by the employing board on probable cause. An Executive Session is mandated by law and cannot be omitted by fiat of the Chancellor, or by any other law, rule or agreement. At no time did Plaintiff waive her rights to the process as stated in the charging papers to determine probable cause on her 3020-a charges, with an Executive Session held by the Panel For Educational Policy ("PEP") before being served the charges. Here, there was no Executive Session and the Defendant did not comply with Education Law 3020-a.

Therefore, the Arbitrator had no subject matter jurisdiction to proceed with the case against Plaintiff. She should have immediately withdrawn all charges. Alternatively, the Arbitrator should have adjourned the hearing until there had been a vote in an Executive Session by the school board and a proper determination of probable cause. Pollack did not do that.

Plaintiff argued that the hearing could not proceed due to the unwaived procedural defect cited in her Motion. See Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630

37

N.Y.S.2d 274,654 N.E.2d 95 [1995]. Upon information and belief, the Department placed

Arbitrators on the 3020-a panels without explaining the procedural defect, however this does not

cure the problem of subject matter jurisdiction. Arbitrators cannot grab subject matter jurisdiction

out of thin air.

Fraudulent concealment of a secret waiver of the rights of tenured employees to the tenure law

Education Law 3020-a(2)(a) by the NYC Department of Education cannot be sanctioned.

The United States Supreme Court has defined waiver as "an intentional relinquishment or

abandonment of a known right or privilege." Johnson v. Zerbst, 304 U. S. 458, 464 (1938). Courts

should "indulge every reasonable presumption against waiver, Aetna Ins. Co. v. Kennedy, 301 U. S.

389, 393 (1937), and they should "not presume acquiescence in the loss of fundamental

rights," Ohio Bell Tel. Co. v. Public Utilities Comm'n,301 U. S. 292, 307 (1937).

In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held:

"Presuming waiver from a silent record is impermissible. The record must show, or there must be an

allegation and evidence which show, that an accused was offered counsel but intelligently and

understandably rejected the offer. Anything less is not waiver." Id., at 516. Additionally, a waiver of

a teacher's tenure rights must be knowingly and freely given (Matter of Gould v. Bd. of Educ. of the

Sewanhaka CHSD, et al., 81 NY2d 446; Matter of Abramovich v. Bd. of Educ. of the Three Villages

CSD No. 1, 46 NY2d 450).

Tenured teachers have a property and liberty right to their jobs, and therefore when there is any

penalty that reduces the benefits of these rights, there must be Just Cause. Plaintiff argues here that

there was no Just Cause to proceed with the 3020-a arbitration in her case, and the Arbitrator

precluded any student records from being presented, thus prejudicing the process used to terminate

Plaintiff even further.

Judge Desmond Green in the Richmond County Supreme Court ruled on March 29, 2018 in the

case of Rosalie Cardinale that:

"New York State created the public school tenure system guaranteeing continued employment to tenured teachers by statute and therefore created a property right in a tenured teacher's continued employment. *(See Education Law§§§ 3012, 3012- a, 3020, Holt v. Board of Educ. Of Webutuck Cent. School Dist.,* 52 NY2d 625 [1981], *Matter of Abromvich v. Board of Educ. of Cent. School Dist. No. I of Towns of Brookhaven & Smithtown,* 46 NY2d 450 [1979]). Where a property right in continued employment exists, such as New York's tenure system, the recipient of such a right may not be deprived without due process. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 [1985].

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] ... shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement ... " *Education Law* § 3020.

The statutory procedural process afforded to teachers with tenure under *Education Law* §3020-a requires:
The filing of charges "in writing and filed with the clerk or secretary for the school district or employing board during the period between the actual opening and closing of the school year for which the employed is normally required to serve. *Education Law§* 3020-a(l)

"Within five days after receipt of charges, the employing board, in executive session, shall determine, by a vote of a majority of all the members of such board, whether probable cause exists to bring a disciplinary proceeding against the employee pursuant to this section." *Education Law* § 3020-a(2).

Where an employing board determines probable cause exists for discipline the tenured teacher shall receive: "a written statement specifying (i) the charges in detail, (ii) the maximum penalty which will be imposed by the board if the employee does not request a hearing or that will be sought by the board if the employee is found guilty of the charges after a hearing and (iii) the employee's rights under this section, shall be immediately forwarded to the accused employee." Id.

Green summarized his conclusion that there was a procedural error of law:

"Hearing Officer Lendino conducted the *Education Law* § 3020-a hearing based on unproven assumptions that the delegations of duties and responsibilities from the office of the Chancellor to subordinate administrators occurred in compliance with the relevant statutory authority."

It is clear that a decision of an Arbitrator who proceeds without getting a signed waiver from the

charged employee shows bias against the employee and an excess of authority that is not

sanctioned by any statutory authority.  The requirements of NYS Education Law §3020-a, under

which tenured personnel may be disciplined for "just cause" are absolute and require that before

charges can be brought against a tenured educator, the school board[1] [PEP] must:

   a.   Determine that there is "probable cause" for the proceeding with charges by a
        majority vote by the Board.

   b.   Make this determination within 5 days of the charges being filed with the Board.

   c.   Ensure that the decision to proceed with the charges is not frivolous, arbitrary,
        capricious or discriminatory.

The legislative intent is to provide pedagogues protection from vindictive principals who may want

to remove senior teachers from their positions for random, arbitrary or capricious reasons.  Thus,

Education Law 3020-a(2)(a) is an important part of the efforts of legislators to maintain a check

and balance of power in NY State governance and policy.

Moreover, because the Chancellor has no vote as a member of the Panel for Educational Policy,

he/she lacks the authority to grant any individual the authority to make a probable cause

determination.  Even if the Chancellor had been given the duties of the school board, this would

still mandate a vote in an Executive Session before any charges were served on Plaintiff. This did

not happen. The charging papers had no date for the Executive Session taking place at any time and

the Plaintiff has never waived her right to a hearing pursuant to the Education Law 3020-a 2(a).

The statutory procedures for filing charges against Plaintiff were completely disregarded and her

tenure rights were not protected. Compliance with Education Law 3020-a(2)(a) is a jurisdictional

condition precedent to a §3020-a disciplinary hearing. Without it, the hearing should not have

moved forward. Prohibition is the appropriate procedural remedy for the assertion of Plaintiff's claim

---

[1] In the City of New York, the Panel for Educational Policy ("PEP") serves as the "school board".

where prohibition is available "to prevent a body or officer from proceeding or threatening to proceed without or in excess of its jurisdiction." See: Matter of Schumer v. Holtzman, 60 N.Y. 2d 46, 51. The Motion To Dismiss presented here by Defendant cannot be granted.


## POINT II: THE FIRST AMENDMENT RETALIATION CLAIM IS VALID

Defendant argues that Plaintiff's First Amendment Retaliation claim is legally insufficient and "little more than bare legal conclusions" because Plaintiff fails to plead any facts plausibly suggesting that any of the rights to which Plaintiff is entitled under the Amendments to the United States Constitution were violated in any manner, let alone violated pursuant to an official policy, practice or custom.

In order to prevail on a First Amendment retaliation claim, a Plaintiff must demonstrate that she engaged in speech protected by the First Amendment, that she suffered an adverse employment action, and that a causal connection between the two existed, "in that the speech was a substantial or motivating factor for the adverse employment action." Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 313 (2d. Cir. 2005). The threshold inquiry in any First Amendment retaliation case is whether the employee was speaking as a citizen on a matter of public concern. Woodlock v. Orange Ulster B. 0. C.E.S., 281 F. App 'x 66, 68 (2d. Cir. 2008) (quoting Garcetti v Ceballos, 547 U.S. 410, 418 (2006)).

The inquiry into whether an individual was speaking as a citizen "is a practical one." Garcetti, 547 U.S. at 424-25. Speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government." Id. At 423. Factors that have been considered by courts, but none of which are dispositive, are whether the speech occurred in the workplace; whether the speech concerns the subject matter of the employee's

41

job; the plaintiffs job description; the person to whom the speech was directed; and whether the speech resulted from special knowledge gained through the Plaintiff's employment. See Garcetti, 547 U.S. at 420-21.

There is no dispute that in May 2018 Plaintiff was fired from her position as a chemistry teacher. What is in dispute is what motivated the Principal to pursue charges, and why did the Arbitrator find Just Cause for such an extreme penalty. Plaintiff's speech on the grading fraud at The College Academy in 2017 (EX. I.) was not of the type normally made as part of her official duty. Nowhere in her job description was she required to raise concerns about the school's budget, or investigate budgetary misconduct and inappropriate actions by the school's administration. Nor have the Defendants pointed to any specific duties of Plaintiff as an employee of the DOE necessary to engage in such behavior. Plaintiff's speech involved matters affecting her entire school and community, and Plaintiff went outside of her school to file her complaint.

Plaintiff's speech did not concern issues for which "there is no relevant citizen analogue," but rather was motivated by her concerns as a member of the community and by information available to the public. Massaro v. New York City Dep 't of Educ., 2012 U.S. App. LEXIS 10911 (2d. Cir. May 31, 2012) (Plaintiff's complaints concerned internal safety and medical absence-related forms, "for which there is no relevant citizen analogue." Further, her complaints concerned her ability to properly execute her duties as a teacher). Neither was Plaintiffs speech "part and parcel" of her official duties as a teacher, as a teacher's duties clearly do not encompass reporting on budgetary irregularities. Matthews v. Lynch, 2012 U.S. LEXIS 10463 (2d. Cir. May 24, 2012) (holding that when a Connecticut State Police officer, whose official duties as part of the Internal Affairs Unit included investigating police misconduct, subsequently learned of departmental misconduct in the course of performing his investigations and reported this to the state's Attorney General, he was acting within the scope of his duties as a public employee); Ross v. Breslin, 693 F.3d 300, 306 (2d

Cir. 2012) (holding that the duties of a payroll clerk-typist for a school district who reported

financial malfeasance plainly included reporting pay irregularities to a supervisor). Plaintiff was not

speaking generally as an advocate for her students, nor as an employee as part of her duties, but as a

citizen concerned misconduct affecting not just her classroom or school, but the entire community.

Pickering v. the Board of Education of Township High School, 391 U.S. 589 (1968).

A speaker's motive is not dispositive in determining whether her speech addresses a matter of public

concern. Rather, whether or not the speech addresses a matter of public concern must be determined

by the "content, form and context of a given statement, as revealed by the whole record." Sousa v.

Roque, 578 F.3d 164, 170 (2d. Cir. 2009).

Whether an employee's speech was made pursuant to his "'official duties is 'a practical one,'

Weintraub v. Bd. of Educ., 593 F. 3d 196,202 (2nd Cir. 2010) quoting Garcetti v. Ceballos, 547 U.S.

410,424, 126 S. Ct. 1951, 164 L.Ed.2d 689 (2006), focusing on whether the speech " was part-and-

parcel of his concerns about his ability to properly execute his duties.". However, the inquiry of

whether the employee is speaking pursuant to his/her official duties is not susceptible to a bright line

rule. Ross v. Breslin, 693 F. 3d 300 (2nd Cir., 2012). Courts must examine the nature of the

plaintiff's job responsibilities, the nature of the speech, and the relationship between the two; and

consider other contextual factors, including whether the complaint was conveyed to the public.

Whether an employee's speech addresses a matter of public concern is a question of law to be

determined based on the "content, form and context of a given statement, as revealed by the whole

record." Lewis v. Cowen, 165 F.3d 154, 163 (2nd Cir. 1999) citing Connick v. Myers, 461

U.S. 138, 147-48 (1983), n. 7. An "[e]mployee's expression is not a matter of public concern when it

'cannot be fairly considered as relating to any matter of political, social, or other concern to the

community'." Singh v. City of New York, 524 F3d. 361,372 (2nd Cir. 2008) quoting

Connick, 461 U.S. at 146. However, criminal conduct relating to public education is generally

recognized as a matter of public concern. See Cioffi v. Averill Park C nt. Sch. Dist., 444 F.3d 158,

164 (holding, in part that criminal activity in schools is of "social" or "other" concern

to communities); Ramirez v. Hempstead Union Free Sch. Dist. Bd. of Educ., _F.Supp.2d_, (2014

WL 3547374) *11 (E.D.N.Y.)(denying defendant's motion to dismiss finding that school employee

reporting unlawful and illegal inflation of student grades to procure county and state

funding constituted speech that touched on a matter of public concern); see also Tucker v. City

of New York, _F.Supp.2d_, 2011 WL 2893077, *5 (S.D.N.Y.) (holding that allegations of

corruption and misuse of public funds by supervisors and coworkers are matters of public concern);

see generally, Jackler v. Byrne 658 F.3d 225 (2nd Cir. 2011) (holding that speech pertaining to

police misconduct is a matter of public concern).

Accepting Plaintiffs averments as true, it cannot be said as a matter of law that citing improper

actions of staff who are altering students' grades so that unqualified students can graduate were part

and parcel of Plaintiff's primary duties.

Moreover, since there is no bright line rule relating to what speech constitutes matters within the

primary duties of a public employee's duties, discovery needs to occur to learn exactly what was the

nature of the Plaintiff's job responsibilities, the nature of the speech and the relationship between the

two before a Court can be decided whether the plaintiff can continue to pursue her First Amendment

retaliation claim. Matthews v. City of New York, 488 Fed Appx. 532, 533 (2nd Cir. 2012)

(summary order).

In order to establish a causal connection at the pleading stage, the "allegations must be 'sufficient to

support the inference that the speech played a substantial part in the adverse action.'" Davis v.

Goord, 320 F.3d 346, 354 (2d Cir.2003); see also Shekhem' El-Bey v. City of New York. 419

F.Supp.2d 546, 552 (S.D.N.Y.2006). The Second Circuit has no bright line for how close in time the

adverse employment action must follow the protected activity in order to sustain the causation

element. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F. 3d 158, 167-68 (2nd Cir. 2006)

(quoting Morris v. Lindau, 196 F.3d 102, 110 (2nd Cir. 1999). On a motion to dismiss, a reasonable

inference of a causal connection is all that is required. See Posr v. Court Officer Shield # 207, 180

F.3d 409, 418 (2d Cir.1999) ("[T]he plaintiffs pleading need not clearly establish that the defendant

harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an

inference to that effect."); Rivera v. Cmty. Sch. Dist. Nine, 145 F.Supp.2d 302,309 (S.D.N.Y.2001).

This "can be established either indirectly by means of circumstantial evidence, for example, by

showing that the protected activity was followed by adverse treatment in employment, or directly by

evidence of retaliatory animus." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir.1999). A court must

"exercise its judgment about the permissible inferences that can be drawn from temporal proximity

in the context of [each] particular case [ ]," Espinal v. Goard. 558 F.3d 119, 129 (2d Cir.2009).

Where a plaintiff asserts enough direct evidence of retaliatory animus to create a triable question of

fact on the issue of a causal connection as here, a longer lapse between the protected speech and the

adverse employment action does not necessarily "conclusively establish lack of causation." See

Mandel v. County of Suffolk, 316 F.3d 368, 384 (2nd Cir. 2003).

Here, Plaintiff's speech is directly related to her charges and termination.

Clearly, Plaintiff's speech involved a matter of public concern. The content of the speech was

misconduct of the school's budget, paid by taxpayer money and public funds, matters which clearly

affect the entire community.

Based on the above, sufficient facts clearly have been alleged under the applicable case law to

withstand Defendants' motion to dismiss and to warrant further factual pretrial discovery.


## POINT III: PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS MUST SURVIVE THE MOTION TO DISMISS

Clearly Plaintiff was treated differently with malicious retaliatory animus for not speaking English adequately, and being Hispanic. See EX. H and The Gulino Litigation. Throughout the NYC public school system teachers who are Black or Latina are treated differently than similarly situated other District employees, including those who commit the illegal acts reported by Plaintiff, with the express illegal intent to punish whistleblowers. Thus, Plaintiff has successfully alleged belonging to a class that consists of more than one individual. The Equal Protection Clause requires only that the classification drawn by the statute be rationally related to a legitimate state interest.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated  should be treated alike. Plyler v. Doe, 457 U.S. 202, 216 (1982).Section 5 of the Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal  protection.  The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.

Additionally, Plaintiff has successfully alleged an equal protection cause of action under a selective enforcement theory of liability. The courts within the Second Circuit are divided whether such a selective enforcement is permitted in the wake of the United States Supreme Court in Engquist v. Oregon Dep't of Agr., 553 U.S. 591 (2008), (held that "class of one" claims no longer exist in a public employment setting); Gentile v. Nulty. 769 F. Supp. 2d 573, 583 (S.D.N.Y. 2011); citing Kamholtz v. Yates County, 350 Fed.Appx. 589, 591 (2d Cir.2009), Faulks v. City of Hartford. 2010 WL 259076, at *7  (D.Conn.  2010),  Sloup v. Loeffler, 2008 WL 3978208, at *14 n. 18 (E.D.N.Y. 2008).

The elements of a selective enforcement cause of action are "(1) that [s]he was treated differently from others similarly situated, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Fierro v. New York City Dep't of Educ., 994 F. Supp. 2d 581, 592-93 (S.D.N.Y. 2014), appeal dismissed (Apr. 9, 2014). quoting Gentile, 769 F.Supp.2d at 578.

It is without a doubt that the Plaintiff has successfully alleged the necessary elements of a selective enforcement of the Education Law processes behind teacher discipline outcomes. With regard to the first element, similarly situated individuals, a plaintiff need not provide evidence of similarly situated individuals at the motion to dismiss stage, so long as the facts as alleged to permit a jury to conclude that they are similarly situated. Vaher v. Town of Orange town, N.Y., 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013), citing Mosdos Chofetz Chaim. Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679,697 (S.D.N.Y. 2011).

As to the second element of the selective enforcement cause of action, it is without a doubt that Plaintiff has successfully alleged that the differing treatment by the Defendants was in order to punish the Plaintiff for exercising her First Amendment rights as a whistleblower and was done maliciously and with the bad faith intent to harm her. Thus, it is clear that Plaintiff has successfully alleged a selective enforcement cause of action that must survive as a matter of law. Plaintiff has also sufficiently alleged a Due Process cause of action, as she, a tenured teacher, has a constitutionally protected property interest in her employment. Plaintiff also has a constitutional property interest in her educational licenses, which were effectively taken away through the Defendants' campaign to blacklist the Plaintiff in the field of public education. ("The problem code") Mudge v. Zugalla, 2014 WL 2453353, at *8 (N.D.N.Y. June 2, 2014). In Mudge, the plaintiff, a substitute teacher, alleged termination of at-will employment in connection with a calculated effort

47

to prevent the plaintiff from obtaining employment and using his licenses when the defendants,

including investigators from the State Education Department were spreading untruths to potential

employers. The court held that discovery was necessary to ascertain the Defendants' exact roles to

establish whether the defendants were low level government officials and whether the actions

alleged were random or specifically designed to deprive the plaintiff of his constitutional rights..

In order to successfully allege a claim for a substantive due process violation, it must be alleged that

the government action being challenged was "arbitrary, conscience shocking, or

oppressive in a constitutional sense. Substantive due process does not protect against government

action that is incorrect or ill-advised. While there is no clear standard for what actions are deemed

conscience shocking,  it has been held that it stems from actions that are "malicious and sadistic

abuses of government power that are intended only to oppress or to cause injury and serve no

legitimate government purpose unquestionably shock the conscience. Such acts by their very nature

offend our fundamental democratic notions of fair play, ordered liberty and human

decency." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 251-52 (2d Cir. 2001), citing

Cty. of Sacramento v. Lewis, 523 U.S. 833, 847  (1998), Breithaupt v. Abram, 352 U.S. 432,435

(1957).

The claims contained within the four corners of Plaintiff's Complaint go straight to the heart of a

substantive due process claim. The very idea that a person's livelihood through tenure, which is

supposed to be determined through a fair evaluation of an educator's job performance, is denied in

open and blatant retaliation for reporting illegalities and improprieties within public education

absolutely offends the notations of fair play and shocks the conscience. There is no reasonable

interpretation of the actions alleged within the Complaint that would result in the malicious targeting

of a whistleblower as being merely "incorrect or ill advised." Even if such a definition is up for

debate, it is inapplicable in a motion to dismiss stage and a simple reading of the Complaint amply

demonstrates that conscience shocking behavior has been sufficiently alleged to permit this cause of

action to continue through to discovery as a matter of law.


POINT IV: THE COURT SHOULD EXERCISE SUPPLEMENTAL
JURISDICTION

The court has the authority to exercise pendent jurisdiction over state law claims that stem from

a "common nucleus of operative fact".  Moore v. County of Suffolk, 851 F.Supp.2d 447,458

(E.D.N.Y. 2012). Constitutional claims are sufficient to support jurisdiction over pendent state

law claims when the constitutional claim is not wholly insubstantial or obviously frivolous. Id.

Here, the Plaintiff's constitutional causes of action are sufficiently alleged within the Complaint

to allow for continued survival of the state law claims. Since the court has original jurisdiction

to hear the federal claims asserted by Plaintiff, it should also exercise its right to supplemental

jurisdiction to hear the state claims.

CONCLUSION

For the reasons set forth above, Defendants Motion to Dismiss should be denied in all respects

and the Court should grant any other, further and different relief that it deems just and

appropriate.

Dated: January 29, 2020


Reyna Arroyo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

REYNA ARROYO,

                         Plaintiff                DOCKET NO. 19-CV-7416 (ER)

      -against-                                DECLARATION IN
                                            OPPOSITION TO
                                            DEFENDANTS'
THE DEPARTMENT OF EDUCATION OF          MOTION TO DISMISS
THE CITY OF NEW YORK,

                        Defendant

———————————————————————— x

       REYNA ARROYO, the pro se Plaintiff in the matter presented herein, states

subject to the penalties of perjury:

1.      I am fully familiar with the facts and circumstances of this matter as the Plaintiff pro

se in this case.

2.      This Declaration is submitted in opposition of the Defendants' Motion to Dismiss

my Complaint ("the Complaint") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal

Rules of Civil Procedure.

3.      In opposition to the Defendants' Motion To Dismiss annexed hereto as Exhibit "A"

       Through "K" are the following:

- A: Specifications charged in 3020-a
- B: Determination of Probable Cause in the charges
- C: Motion To Dismiss For Lack of Subject Matter Jurisdiction
- D: Delegation Memo signed by Carmen Farina, 2014
- E: PEP Bylaws
- F: No-waive tenure rights case

- G: Decision of Judge Green in the case of Rosalie Cardinale
- H. Gulino Judgment, Complaint, 2013 Order, Report of the Special Master
- 1. Arroyo's letter to SCI 2017, with grades
- J: Shlomo article in website "Risk Management", and Combier AFFIDAVIT
- K: Judge Hagler Recusal Motion

Date: January 31 2020

Reyna Arroyo
651 Tilden Avenue
Teaneck, N.J. 07666

Sworn Before me on:

January 2020

Notary Public

MONIQUE MCDANIEL
Notary Public - State of New York
NO. 01MC6343430
Qualified in New York County
My Commission Expires Jun 13, 2020

# EXHIBIT A

**NEW YORK STATE EDUCATION DEPARTMENT**
**UNIT OF SCHOOL DISTRICT**
**EMPLOYER-EMPLOYEE RELATIONS**

In the Matter of the Charges Preferred By:

BOARD OF EDUCATION OF THE CITY OF
NEW YORK,
　　　　　　　　Complainant-Employer,　　　　　**SED File No.** _____

v.

　　　　　　　　　　　　　　　　　　　　　　　　**SPECIFICATIONS**

REYNA ARROYO
　　　　　　　Respondent-Tenured Teacher,

Pursuant to Education Law Section 2590 (j) (7)
and Section 3020-a

## INTRODUCTION

　　　The Board of Education of the City of New York, also known as the New York City Department of Education, brings this action pursuant to Education Law § 3020-a against Reyna Arroyo for her failures in the nature of incompetent and inefficient service, neglect of duty and unwillingness and/or inability to follow procedures and carry out normal duties during 2014-2015, 2015-2016 and 2016-2017 school years.  Reyna Arroyo (hereinafter "Respondent"), under File #0726249, is a tenured teacher assigned to The College Academy (06M464), located in District 6 in Manhattan.

## SPECIFICATIONS

1. During the 2014-2015, 2015-2016 and 2016-2017 school years, Respondent failed to properly, adequately, and/or effectively plan and/or execute separate lessons as observed on or about each of the following dates:

    a. November 12, 2014;
    b. March 18, 2015;
    c. May 14, 2015;
    d. December 4, 2015;
    e. May 6, 2016;
    f. May 18, 2016;
    g. September 29, 2016;
    h. January 4, 2017;
    i. February 16, 2017;
    j. March 23, 2017; and/or
    k. May 22, 2017.

2. Respondent failed, during the 2014-2015, 2015-2016 and 2016-2017 school years, to fully and/or consistently implement directives and/or recommendations for pedagogical improvement and professional development provided in observation conferences with administrators and/or outside observers; instructional meetings; teacher improvement plans; one-on-one meetings with administrators, school based coaches, and/or outside observers; as well as schoolwide professional development, with regard to:

    a. Proper planning, pacing, and/or execution of lessons;
    b. Using appropriate methods and/or techniques during lessons;
    c. Demonstrating knowledge and content of pedagogy;
    d. Designing coherent instruction;
    e. Using questioning and discussion techniques;
    f. Using assessment in instruction; and/or
    g. Student engagement.

2

THE FOREGOING CONSTITUTES:

1. Just cause for disciplinary action under Education Law § 3020-a;
2. Incompetent and/or inefficient service;
3. Conduct unbecoming Respondent's position;
4. Conduct prejudicial to the good order, efficiency, or discipline of the service;
5. Neglect of duty;
6. Substantial cause rendering Respondent unfit to properly perform obligations to the service; and
7. Just cause for termination.

Dated: June 16, 2017

New York City Department of Education
Howard Friedman, General Counsel
By: Genna Saltzman
100 Gold Street, 3rd Floor
New York, New York 10038
Tel: (212)374-5903
Fax: (212)374-0051

# EXHIBIT B



**The University of the State of New York**
The State Education Department
Teacher Tenure Hearing Unit
EBA Room 981
Albany, New York 12234

Ph:  (518) 474-3021
Fax:  (518) 402-5940

(08/12)

### Notice of Determination of Probable Cause on Education Law §3020-a Charges

| Instructions: | This Notice must be served on the tenured employee along with a copy of the Education Law §3020-a charges, the Rights of Tenured Employees form and the Hearing Request/Waiver form. |
|---|---|

### Tenured Employee Information

| Name | Reyna Arroyo |
|---|---|
| Address | 651 Tilden Avenue |
| Address | |
| City, State, Zip | Teaneck, NJ 07666 |

### Notice to Tenured Employee

| Date Charges Filed: | 6/19/2017 | Date of Executive Session: | |
|---|---|---|---|

Please be advised that at a meeting in executive session on the above date the school district identified herein has found that there is probable cause for Education Law §3020-a charge(s) against you. The specific charges are attached to this form. Within <u>ten</u> (10) days of receipt of these charges, you must elect to request a hearing before an impartial hearing officer, or waive your right to such a hearing. Should you fail to so request or to waive your right to a hearing within the specified ten days, the district clerk or the secretary of the board of education will notify both you and the Commissioner of Education that a waiver has been deemed to have occurred and that the board of education will meet to determine the case and fix the penalty or punishment, if one is to be imposed.

### School District Information

| District Name | The College Academy (06M462) | | |
|---|---|---|---|
| Address | 549 Audubon Avenue | Phone 1 | |
| Address | | Phone 2 | |
| City, State, Zip | NY, NY 10040 | Fax | |
| Contact Name | Principal Timothy Sigerson | Email | Tsigerson@schools.nyc.gov |

### Authorized Signature

| Name | | Date | 6/19/2017 |
|---|---|---|---|

# EXHIBIT C

NEW YORK STATE EDUCATION DEPARTMENT
TEACHER TENURE HEARING UNIT
BEFORE: ARBITRATOR LISA POLLACK, Esq.

---

In the Matter of the Disciplinary Proceeding of

DEPARTMENT OF EDUCATION                    RESPONDENT'S MOTION TO DISMISS
OF THE CITY OF NEW YORK,

                    Complainant,

-against-

REYNA ARROYO,

                    Respondent-Tenured Teacher,

Pursuant to §3020-a of the *Education Law.*

---

        DAVID BARRETT, ESQ., an attorney duly admitted to practice law in the courts

of the State of New York, hereby affirms under penalty of perjury:

        1.      I am the attorney for the Respondent in the above captioned matter, and

am fully familiar with the facts and circumstances surrounding the within matter.

        2.      Respondent submits this motion to dismiss the disciplinary action against

Respondent Reyna Arroyo ("Respondent") pursuant to Education Law §3020-a.

        3.      Respondent submits that the charges proffered against her ("charges")

are defective as they fail to adhere to Education Law §3020-a (2)(a) as there has been

no vote by the employing board on probable cause. The charging paper titled "Notice

of Determination of Probable Cause on Education Law §3020-a Charges" has no date

for the Executive Session as mandated. See attached. Principal Timothy Sigerson

signed the charging papers on 6/19/17 after he, alone, not the school board, "found"

probable cause, yet nowhere in Education Law §3020-a is there a provision authorizing

1

a Principal (or any single individual) to make a determination of probable cause. Likewise, Chancellor Carmen Farina also has no authority to determine probable cause, only to initiate the charging process without making any conclusions. Moreover, because the Chancellor has no vote as a member of the Panel for Educational Policy, she lacks the authority to grant any individual the authority to make a probable cause determination. Even if the Chancellor was given the duties of the school board, this would still mandate a vote in an Executive Session before any charges were served on Respondent. This did not happen. The charging papers have no date for the Executive Session.

4.     Accordingly, the Hearing Officer has limited, if any, authority to rule or issue any penalty or determine just cause on the charges presented by the Department in this matter. (See the PEP Bylaws, attached).

## EDUCATION LAW §3020-A MANDATES A VOTE ON PROBABLE CAUSE  BY A SCHOOL BOARD

5.     Education Law §3020 provides, in pertinent part, that "[n]o person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section 3020-a." As a tenured teacher, Respondent possesses a constitutionally protected property interest in her position of employment which may not be diminished in any manner without being accorded substantive fair hearing and due process rights. Matter of Soucy v. Board of Education of North Colonie Central School Dist No. 5, 41 A.D.2d 984, 343 N.Y.S.2d 624 (3rd Dep't 1973)).

2

6.      The requirements of NYS Education Law §3020-a, under which tenured personnel may be disciplined for "just cause" are absolute and require that before charges can be brought against a tenured educator, the school board[1] [PEP] must:

a.      Determine that there is "probable cause" for the proceeding with charges by a majority vote by the Board.

b.      Make this determination within 5 days of the charges being filed with the Board.

c.      Ensure that the decision to proceed with the charges is not frivolous, arbitrary, capricious or discriminatory.

7.      This vote by the school board is required under Education Law 3020-a for a proper determination of "probable cause" upon which to bring charges against teachers removed from their schools. (Education Law §3020-a, Article 61). A determination of probable cause by an Independent Executive Session must, according to law, occur after charges are made against a tenured employee in order to mitigate against malicious prosecution (which is precisely what is transpiring here). The legislative intent is to provide pedagogues protection from vindictive principals who may want to remove senior teachers from their positions because they make salaries that could pay for two teachers instead of one, or other unlawful reasons.

8.      Education Law §3020-a **requires a vote by the school board [PEP] as the basis for deciding to charge a tenured employee**. (Education Law §3020-a(2)(a)). There has been no such vote in Ms. Arroyo's case.  Since the very statute upon which this hearing is based has been flouted, should the within dismissal motion be denied, it

---

[1] In the City of New York, the Panel for Educational Policy ("PEP") serves as the "school board".

would be a clear violation of Ms. Arroyo's constitutional right to due process and equal protection under the law.  The statutory procedures in this case were completely disregarded and there was no oversight by anyone other than the tenured teacher's principal to initiate the disciplinary process to file charges against Ms. Arroyo or any other educator a principal chooses to remove from the school the principal administers. The employee's tenure rights were not protected. Because of the open and obvious procedural defects, dismissal of all charges is warranted.

9.      The total lack of independent review and lack of oversight by anyone other than the tenured teacher's principal to initiate discipline is blatantly inconsistent with Education  Law §3020-a. This constitutes a *de facto* denial of equal protection of the §3020-a law and denies tenured employees their constitutional rights to due process.

10.      Arbitrators who sit on the panel to hear 3020-a charges are not permitted by law, collective bargaining agreement, or any other contractual arrangement to make a decision on charges unless they have been voted on by the New York  City  Board  of Education ***before*** a tenured teacher is charged, pursuant to Education Law §§ 3020 and 3020-a. Arbitrators who work on NYC cases either under the Administrative Trials Unit ("ATU") or Teacher Performance Unit ("TPU") received these procedures and guidelines at a plenary meeting held at the New York City Department of Education headquarters on February 24, 2015. See documents posted on the blog "NYC Rubber Room Reporter" at:

http://nycrubberroomreporter.blogspot.com/2016/05/the-3020-arbitration-newswire-digging_28.html                    and,

4

http://www.parentadvocates.org/nicemedia/documents/Emails-release-version.pdf

11.      Respondent requested a hearing pursuant to §3020-a of the Education Law, and her charging papers state that "...a meeting in executive session on the above date...has found that there is probable cause...", attached, has no information on where this meeting took place, when, who attended, or who voted probable cause. Before a tenured teacher can be brought up on disciplinary charges, the Education Law sets a number of procedural hurdles that a Board of Education must comply with. These procedural hurdles are in place to protect the rights of the tenured teacher to fair process, and constitute jurisdictional pre-requisites to a §3020-a disciplinary hearing. The United States Constitution, the laws of New York State and public policy all recognize and uphold tenure rights - foremost being the right to due process-- and the determination of probable cause cannot be bargained away by any collective bargaining agreement which diminishes these rights, nor by fiat of the Chancellor.

12.      Compliance with this provision is a jurisdictional condition precedent to a §3020-a disciplinary hearing. Without it, the hearing cannot go forward. Prohibition is the appropriate procedural remedy for the assertion of respondent's claim where prohibition is available "to prevent a body or officer from proceeding or threatening to proceed without or in excess of its jurisdiction." See: Matter of Schumer v. Holtzman, 60 N.Y. 2d 46, 51. In this disciplinary hearing, the Department seeks to terminate respondent, a tenured teacher, and as such, deprive her of a constitutionally protected interest without satisfying the statutory pre-requisites.

13.      Here, the Department seeks to deprive respondent of her

5

Constitutionally protected interest by serving her with charges without the statutorily requisite finding of probable cause. This compounds the procedural errors of this matter which are prejudicial to the lawful, fair hearing the respondent can argue is rightfully hers under the law. Respondent requests either the arbitrator dismiss the charges on the errors of procedure, or make a ruling that the charges may be filed in the future concerning the charged school years contained therein if and when the procedures for charging complies with Education Law 3020-a(2)(a). Respondent hereby reserves her right to continue her objection to the procedural errors seen and cited herein.

14.     Anticipating the same misplaced argument brought by the DOE time and again in opposition to this motion, *preferring* charges against a tenured employee is not at all the same as a *finding* of probable cause pursuant to Education Law §3020-a(2)(a).

**WHEREFORE,** the respondent respectfully requests that the Arbitrator dismiss all charges due to the procedural errors on the probable cause determination and grant such other and further relief as is deemed just, proper and equitable.

Dated:  New York, New York
        November 8, 2017

Respectfully submitted,

_____/s/_____
David Barrett
Attorney for Respondent