UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
REYNA ARROYO,

                Plaintiff,

    v.

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK,

                Defendant.
-----------------------------------------------------------X

Case No.: **19 CIV 7416**

**AMENDED COMPLAINT
AND JURY DEMAND**

Plaintiff, REYNA ARROYO (hereinafter refers as to "Plaintiff") by and through their undersigned counsel, sues the defendant THE DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK (hereinafter referred to as "Defendant" or "DOE") and, alleges as follows:

**I. PRELIMINARY STATEMENT**

1. This is a civil action based upon Defendant's' violations of Plaintiff's First Amendment Constitutional rights including retaliation for exercising her First Amendment rights under the U.S. Constitution and acting under the State's color of law, Fourteenth Amendment Constitutional rights (Equal Protection claim regarding the arbitrator selection and discrimination on the basis of race and national origin, and stigma plus claim based of being on an ineligible list).[1]

2. This action seeks declaratory, equitable relief, compensatory damages, costs and attorney fees.

**II. JURISDICTION AND VENUE**

3. This Court has jurisdiction pursuant is predicated upon 28 U.S.C. 1331 and 1343 in that this is an action authorized by 42 U.S.C. 1983 and the Constitution of the United States of

---

[1] This action was initially filed *pro se* and included Due Process and Title VII claims which were dismissed.

America to redress deprivations of constitutionally protected speech and interests and equal protection process under the color of state law.

4. This action properly lies in the Southern District of New York because the Defendant's principal place of business is in New York County.

### III. THE PARTIES

5. Plaintiff (Dominican with a discernable accent) was employed by Defendant. Plaintiff's alleges that her First and Fourteenth Amendment rights were violated by Defendant.

6. Defendant the Department of Education of the City of New York is a City School District and existing by virtue of the laws of the State of New York and was Plaintiff's employer at all times relevant in the complaint and is within the jurisdiction of this Court. At all times material hereto, the District, is a political subdivision of the State of New York existing by virtue of the laws of the State of New York and approved of the conduct more specifically set forth below.

### IV. FACTUAL STATEMENT

**BACKGROUND**

7. Plaintiff earned her undergraduate degree in Chemistry in the Dominican Republic in 1990. She began working for Defendant in 1998 as a per diem teacher, and during this time, she took 18 credits in education and earned her Public School teacher Certification.

8. In 2002, Plaintiff received her Master's degree in Bilingual education. In 2001-2002 she worked as a chemistry teacher in Health Careers and Science High School on the GWHS Campus. Throughout her career Plaintiff has received satisfactory ratings and her performance was exemplary.

9. Plaintiff worked in PS 143 in Washington Heights as a community leader during the summers of 2002 - 2005, helping students with Regents Examination preparation.

10. In September 2005, Plaintiff began to work in International Business and Finance High School, a name that was changed in 2010 to The College Academy. She continued to work there until 2015.

11. In 2014, Mrs. Karen Remer became the Assistant Principal of the school where Plaintiff worked. Up until that time, Plaintiff was an exemplary teacher, with satisfactory evaluations. Plaintiff had a good relationship with her colleagues, and her superiors.

12. Between the 2014-2015 and 2015-2016 school year, on several occasions, Plaintiff complained to the Principal and to the Superintendent regarding the administration making fun of Plaintiff's accent, and about improperly changing student's grades to comply with mandated standards.

13. In addition, Plaintiff wrote a letter to the New York State Division of Human Rights about Defendant discriminating against her and mocking Plaintiff's accent. Plaintiff also reported Defendant changing students' grades.

14. Plaintiff further informed the New York Post and NY1 (local news station in New York City) regarding the improper changing of grades. This was around the beginning of 2015.

15. Thereafter, upon information and belief, the NY Post and NY1 contacted Defendant for comment. At least one of the school secretaries confirmed this to Plaintiff.

16. Thereafter, Defendant retaliated as set forth below against Plaintiff until her termination.

17. After these complaints, Remer's ultimate goal was to terminate Plaintiff notwithstanding her satisfactory job performance.

18. Plaintiff was never offered any meaningful professional help for her alleged deficiencies.

19. In June 2015 Respondent received a letter that she was excessed. For the next year she was an ATR, and then in the fall of 2016 she returned to College Academy. She always received satisfactory ratings until suddenly she was given the label of "incompetent" and charged with "unwillingness and/or inability to follow procedures and carry out normal duties".

20. However, Mrs. Remer's discriminatory animus towards Plaintiff was due to her national origin and protected activity and was obvious, even to Plaintiff's colleagues.

21. Plaintiff was ostracized and false accusations were asserted against Plaintiff, without any evidence.

22. For instance, Assistant Principal, Remer had a meeting with all the science teachers and she falsely publicly claimed that Plaintiff's bilingual students were not passing their exams which she attributed to "Plaintiff's struggle with the English language".

23. Ms. Remer further falsely claimed that other teacher's students had a higher success rate, because she in fact spoke the language and Plaintiff did not.

24. Plaintiff respectfully pointed out that records showed differently, at which point Remer interrupted Plaintiff and stated, "you will get yours". This was a threat which was acted upon by subjecting Plaintiff to a hostile work environment due to her race/national origin and accent and her protected activity.

25. In addition, unlike with other teachers, Mrs. Remer would often show up at Plaintiff's classroom in the middle of her lessons without any warning. Remer would interrupt Plaintiff, attempt to make corrections, and was disrespectful towards Plaintiff in front of her students.

26. Further, during staff meetings, Remer would make it difficult for Plaintiff to express her concerns and mocked her accent, even before her colleagues.

27. This was humiliating and was psychologically injurious. It took an emotional toll on Plaintiff, making Plaintiff become highly guarded and anxious. Plaintiff started holding back from being vocal during meetings, but this was also an issue for her so she would then call Plaintiff out in front of others, saying Plaintiff never had anything to say.

28. Further, Remer's behavior towards Plaintiff was obvious to others. Plaintiff's colleagues often approached Plaintiff and often apologized to her for how Plaintiff was being treated by Mrs. Remer.

29. On several occasions, multiple people informed Plaintiff that that she would give them the "results" of the evaluations and made fun of what she believed was wrong with Plaintiff.

30. Remer believed and said that Plaintiff did not speak English and could not be a teacher; that Plaintiff's accent was difficult to understand; that Plaintiff had no control over the students or how to appropriately discipline them. Additionally, she would become very hostile when presenting Plaintiff's evaluation results to her, and made it seem like Plaintiff had no choice but to sign her findings. Ms. Remer told Plaintiff she was the problem.

31. At the beginning of the 2016-2017 school year (the school year following Plaintiff's complaints), Plaintiff was assigned to her usual classroom of many years but that quickly changed.

32. By February of 2017, Plaintiff's classroom was taken and given to a Caucasian teacher, causing Plaintiff to have to transfer to different classrooms during the day to teach.

33. This same teacher approached Plaintiff and was apologetic, stating she did not want Plaintiff to think she had anything to do, and informing Plaintiff that they had told her not

to worry as that was going to be Plaintiff's last year at the school. In other words, there was already a plan set in motion to terminate Plaintiff.

34. Again, this was not communicated directly to Plaintiff, instead it was talked about with others.

35. On June 28, 2017 Plaintiff also wrote a letter to "SCI" (New York City Special Commission of investigations) in order to report unusual and illegal activity occurring from 2011-2017. The letter alleged that Plaintiff was subjected to bullying due to her race and national origin by Defendant's administration; that five student's grades were changed in order to allow them to graduate in 2017; that the school principal allowed a student in the same school year to take the regents exam at a later date than the date assigned for the regents exam; and that the named valedictorian for the school was replaced by another student.

36. After this complaint, Plaintiff was retaliated against even more than before and was targeted on an ongoing basis.

37. Plaintiff's non Dominican colleagues did not experienced the same harassment or unfair treatment that Plaintiff, and neither were they removed from their teaching positions. Further, Plaintiff colleagues did not engage in protected activity.

38. Ms. Remer and the Principal would both show up to Plaintiff's classroom unannounced, something they never did with other non-Dominican teachers who did not engage in protected activity.

39. Plaintiff was given negative evaluations and microscopically managed.

40. The administration constantly bullied Plaintiff at school, made fun of her accent and stated that she did not speak English.

41. Additionally, Plaintiff was never told what areas allegedly required improvement and what to change to meet their expectations. Plaintiff was set up for failure.

42. The following evaluative procedures were not followed on the observations.

43. The DOE did not develop strategies for improvement.

44. The timeframe of many of the observations prevented implementation of recommendations.

45. The observations were biased.

46. The evidence did not align with components and or component ratings in many observations.

47. The evidence is cut and pasted from the Danielson Rubric.

48. The evidence was not lesson specific or is merely a conclusion. Observable components were not rated, and Plaintiff was rated on components not observed. Component rating at times contradicted each other.

**TERMINATION PROCEEDINGS**

49. On June 19, 2017, Principal Timothy Sigerson initiated Plaintiff's termination proceedings by sending Plaintiff a "Notice of Determination of Probable Cause on Education Law 3020-a charges" alleged incompetence. This was a pretext.

50. Arbitrator Lisa Pollack was arbitrarily assigned to preside the 3020-a hearing. Ms. Pollack was not an attorney and is paid by Defendant.

51. On or about June 28, 2017, Plaintiff sent a letter to the NYC Special Commissioner of Investigation (SCI) in order to report "unusual and illegal behavior between 2011-2017" outline above.

52. Plaintiff acted as a private citizen when she sent the letter and also when she complained to the New York Post, News 1 and New York State Division of Human Rights about Defendant's illegal activities as described above.

53. Further, complaining of these illegalities was not part of Plaintiff's school duties as a teacher.

54. Immediately after sending the letter Plaintiff was retaliated against as described above. This time the micromanagement, bullying, bad evaluations and humiliations augmented with the goal to speed up the process of terminating Plaintiff.

55. By May 29, 2018 Plaintiff received the termination decision of Pollack.

56. The decision was arbitrary and without any facts sufficient facts to justify termination of a tenured teacher. Further, it created financial hardship and emotional distress of having Plaintiff's fingerprints flagged by the "no hire" list, or "problem code" note on her fingerprints at the DOE Office of Personnel Investigations.

57. Plaintiff appealed this decision via Article 75 in the New York Supreme Court, but it was denied.

58. Defendant was acting under the color of state law at all times relevant.

**EQUAL PROTECTION AND STIGMA PLUS**

59. Plaintiff's equal protection rights were violated because she was a tenured teacher who could be terminated for cause under a 3020A hearing. However, no proper determination of probable cause as required by the Statute was determined before bringing the 3020A charges against her.

60. Plaintiff did not waive her right to have probable cause hearing determined in her case as per Education Law 3020-a(2)(a).

61. The procedure used by Defendant in Plaintiff's 3020-a case omitted section (2)(a) of the Education Law, where the PEP must go in to an Executive Session and vote on probable cause for 3020-a charges, in order to speed up the process of getting tenured teachers removed. In Plaintiff's case she submitted her objection to the lack of a vote citing Judge Desmond Green's ruling in the Rosalie Cardinale decision which had issues analogous to the issues at hand. This was overlooked by Arbitrator Pollack.

62. By not having conducted a probable cause hearing before the 3020A hearing, Plaintiff was deprived of a constitutionally protected liberty or property interest and her employment, professional reputation and ability to become employ again was greatly damaged.

63. Arbitrator Pollack is not an attorney and was biased against Plaintiff in that she omitted proper protocol and went ahead and conducted the 3020A hearing when the procedural requirements were not met.

64. Further, Plaintiff produced credible witnesses, including teachers and students who testified on Plaintiff's behalf as to her abilities and proficiency to teach. They were not considered in the 3020A decision.

65. Plaintiff was terminated. As a result of the decision, Plaintiff lost her tenured job.

66. As a result of the termination and defamatory statements alleging that Plaintiff was incompetent and not fit teach Plaintiff's professional reputation and job prospects were greatly injured.

67. Plaintiff's name was placed in the ineligible list and her fingerprints were flagged.

68. At all relevant times the NYC DOE has kept the names and personnel file numbers of employees - who have been charged with any number of minor infractions or who have

spoken out about wrong-doing by administrators - on a list called the "Problem Code" or "Ineligible Inquiry List". There is no information on the procedures used, no standards for placement on this list, and no method by which a person so placed may remove his/her name from this list.

69. Plaintiff's name was placed on this list after Principal Timothy Sigerson targeted her for termination by observing her teaching as "incompetent". In actuality, Sigerson was changing student grades to make his school look better in the NY State Statistics, and Plaintiff would not go along with this and was therefore punished.

70. Upon information and belief, teachers do not get off of the problem code list once assigned.

71. What can occur is, an employee at the Defendant's Office of Professional Investigations (OPI) will meet with the affected teacher and "interview" him/her if the person has been appointed to a job within the Department. OPI then decides whether the flag on the fingerprints can or cannot be lifted. There is no known relief without a challenge in Court.

72. Upon information and belief, more than 97% of all visits to OPI are denied removal from the list and told that they cannot re-apply for 12 months. The teachers placed in this list cannot get a job during that time, and there is no grievance, hearing or meeting that any affected teacher can request.

73. As a result of the code, Plaintiff cannot obtain any job at the Department of Education and thus she is stigmatized and unable to work in NYC public schools.

74. In addition, due to being on this list, Plaintiff cannot work at most other private schools in New York City; therefore, Plaintiff's job prospects and ability to work in New York City are for all practical purposes non-existent.

75. Further, Plaintiff lost all the salary she earned and her benefits which she is now unable to obtain due to being flagged in this list.

76. As a result, Plaintiff is barred from taking advantage of any teaching job opportunities.

77. At Plaintiff's hearing, Pollack did not understand that initiating charges and finding probable cause are two different things and did not comply with the Law.

78. Another denial of important rights can be seen in the inconsistent application of the NY State Commissioner's Regulations which permit a charged employee going into a 3020-a hearing to assist in choosing the arbitrator, but not inside the borders of the New York City Department of Education if you are a teacher. If you are an Assistant Principal and/or a Principal, work for the New York City Department of Education, and you are charged with 3020-a, the union, Counsel For Supervisors and Administrators ("CSA"), gives a person the right to choose an arbitrator from a list provided by New York State Education or the Education Department or the American Arbitration Association.

79. In New York, arbitrators are assigned to cases by the Department of Education and are assigned to one of the two permanent panels by the Department and NYSUT, every September. The two panels are: the Administrative Trials Unit ("ATU") or the Teacher Performance Unit ("TPU"), by the Department. This creates a bias which cannot be overcome by the Plaintiff and denies equal protection rights to a "neutral" arbitrator.

## FIRST CLAIM FOR RELIEF-FIRST AMENDMENT

80. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 80 as though fully set forth herein.

81. Plaintiff's advocacy was separate and apart from any of her job responsibilities she had as a teacher but as citizen opining to the press regarding matters that are of a public concern

11

and interest. In fact, Plaintiff's job responsibilities did not include talking to the press. As a direct result of plaintiff speaking to the press, plaintiff was retaliated against as set forth above.

82. Based upon the foregoing, plaintiff was terminated by defendant in violation of the First Amendment.

83. There were no legitimate reasons for the above conduct. The only reason for said action is retaliatory due to Plaintiff speaking to the press.

84. Defendants conduct by retaliating against Plaintiff because of her letter to SCI, complaints to the New York Post, News 1 and the New York State Division of Human Rights, violated Plaintiff's First amendment rights under the U.S. Constitution, U.S.C §1983.

85. As a result of the defendants' actions and in actions as set forth above, plaintiff has been, and continues to be, deprived of her Federal rights under 42 U.S.C., Section 1983 and the the first amendment rights of the U.S. Constitution.

86. As a result of defendants' actions, plaintiff suffered and was damaged.

87. Defendants have deprived plaintiff of such rights under color of State Law.

### **SECOND CLAIM FOR RELIEF-NYS CONSTITUTION ARTICLE I §§ 8-9 AGAINST DEFENDANT-DEPRIVATION OF RIGHTS UNDER COLOR OF LAW**

88. Plaintiff repeats and realleges each and every allegation set forth above with same force and effect as if fully set forth herein.

89. As a result of the defendants' actions and in actions as set forth above, Plaintiff has been, and continues to be, deprived of her rights under the New York State Constitution Article One Section 8 which states in pertinent part: "Every citizen may freely speak, write and

publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." (Emphasis added) and Section 9 which states in pertinent part: "No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government...."

90. Defendant violated Article I §§ 8 and 9 of the New York State Constitution by retaliating against Plaintiff because she spoke out externally and internally on matters of public concern relating to Defendants' illegal practices.

91. Plaintiff was not mandated to speak out and this was not under her duties as a teacher.

92. Defendants have deprived plaintiff of such rights under color of State Law.

93. As a result of Defendant's actions in retaliating against Plaintiff for her speech, Plaintiff has been damaged.

## THIRD CLAIM FOR RELIEF-FOURTEENTH AMENDMENT EQUAL PROTECTION

94. Plaintiff repeats and re-alleges each and cvely allegation contained in paragraphs 1 through 88 as though fully set forth herein.

95. Defendants conduct by discriminating against Plaintiff based on her race and national origin violated Plaintiff's Fourteenth amendment rights under the U.S. Constitution, U.S.C §1983

96. Further, Defendant's arbitrator's selection violated Plaintiff's Fourteenth amendment rights under the U.S. Constitution, U.S.C §1983 as the assignment was biased and the 3020A hearing was conducted without a probable cause hearing

13

97. As a result of the defendants' actions and in actions as set forth above, plaintiff has been, and continues to be, deprived of her Federal rights under 42 U.S.C., Section 1983 and the fourteenth amendment rights of the U.S. Constitution.

## FOURTH CLAIM FOR RELIEF-FOURTEENTH AMENDMENT

## STIGMA PLUS

98. Plaintiff repeats and re-alleges each and cvely allegation contained in paragraphs 1 through 91 as though fully set forth herein.

99. Defendants conduct by placing Plaintiff in the ineligible list violated Plaintiff's Fourteenth amendment rights under the U.S. Constitution, U.S.C §1983 as it stigmatized her and she is now unemployable and unable to secure a job placement with the New York City Department of Education and its affiliates

100. Defendants' actions were and continue to be unlawful, oppressive and a malicious attempt in violation of 42 U.S.C §1983, Fourteenth Amendment to the Constitution.

## PLAINTIFF HEREIN DEMANDS A TRIAL BY JURY

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment in her favor and against Defendants as follows:

    a. Declaring Defendant violated Plaintiff's rights under the U.S. constitution and state law.

    b. Reinstatement of Plaintiff.

    c. Compensatory damages for loss salary and benefits

    d. Damages for Pain and Suffering

    e. Awarding that Defendants pay Plaintiff's costs of this suit, together with reasonable

  attorney's fees   pursuant to 29 U.S.C. 1132 (g) (1);

f. Any other relief that is just and equitable;

Dated: New York, New York
   October 07, 2020

               i.
              STEWART LEE KARLIN
              LAW GROUP, PC

              _/s/ Stewart Lee Karlin_
              STEWART LEE KARLIN, ESQ.
              NATALIA KAPITONOVA, ESQ.
              Attorney for Plaintiff
              111 John Street 22
              New York, NY 10007
              (212) 792-9670